Louise K. NOLLEY, Plaintiff,

v.

COUNTY OF ERIE; Thomas Higgins, Sheriff; John Dray, Superintendent; and Jane O'Malley, Nurse, Defendants.

No. CIV–88–1170C.

United States District Court, W.D. New York.

Oct. 31, 1991.

Damon & Morey (Jennifer A. Coleman, of counsel), Buffalo, N.Y., for plaintiff.

Patrick H. NeMoyer, Erie County Atty. (James L. Tuppen, Asst. County Atty., of counsel), Buffalo, N.Y., for defendants.

## FINDINGS OF FACT

CURTIN, District Judge.

### I. *Background*

Evidence in this non-jury case is now closed. The parties have submitted proposed findings of fact and conclusions of law, and the court has considered summation. The following constitutes the court's findings of fact and conclusions of law.

Plaintiff Louise K. Nolley, a former inmate at the Erie County Holding Center ("ECHC"), has brought this suit against the ECHC and various administrators of the facility alleging that their treatment of her during her confinements in 1988, 1989, and 1989/90 violated her constitutional and statutory rights. Ms. Nolley was confined at the ECHC on three separate occasions:

(1) June 14, 1988, through November 9, 1988 ("1988 confinement");

(2) February 15, 1989, through May 31, 1989 ("1989 confinement");

(3) December 18, 1989, through February 13, 1990 ("1989/90 confinement").

Prior to her first incarceration, Ms. Nolley tested positive for the human immuno-deficiency virus ("HIV+"), the virus associated with Acquired Immune Deficiency Syndrome ("AIDS"). This fact was known by the ECHC's Medical Department throughout Nolley's three confinements. Based on this information, defendants placed on Ms. Nolley's inmate records, medical records, and transportation documents a *red sticker* to indicate to those who came in contact with her that she was infected with a contagious disease.

Defendants also chose to segregate Ms. Nolley from the general population because of her HIV status. She was placed in an area of the Holding Center known as Female Delta Medical Pod ("Female Delta"). Female Delta is a pod for female inmates who are mentally disturbed, suicidal, or dangerous to themselves. Ms. Nolley was also deprived of access to the ECHC's law library and, for most of her three confinements, to the ECHC's regularly scheduled Catholic services. Other inmates housed in Female Delta were, at the same time, permitted to attend religious services and the law library.

Four defendants remain in the case: Erie County, Sheriff Thomas Higgins, Superintendent John Dray, and Nurse Jane O'Malley. Sheriff Higgins is the policy-making official responsible for the operation of the ECHC and the Erie County Sheriff's Department. John Dray is the acting Superintendent of the ECHC. He is responsible for promulgating policies for the Holding Center and supervising its day-to-day operations. Jane O'Malley is the Nursing Supervisor/Administrator at the ECHC. A fifth defendant, Willie Brown, has been dropped from the case.

Plaintiff Nolley seeks damages and injunctive relief. She alleges that ECHC's policy of placing red stickers on various documents and other items violated article 27–F of New York State's Public Health Law, N.Y.Pub.Health Law § 2780 *et seq.* (McKinney 1991 Supp.), State Commission of Correction regulations adopted in accordance with that law, and her constitutional right to privacy. Plaintiff also argues that her segregation in Female Delta violated her state rights under article 27–F and her constitutional rights of privacy, due process, and equal protection. Further, Ms. Nolley alleges that the conditions

of her confinement violated her Eighth Amendment rights. She also brings constitutional claims for ECHC's denial of access to the law library and religious services. Finally, Ms. Nolley argues that defendants discriminated against her in violation of the Rehabilitation Act, 29 U.S.C. § 794.

## II. *HIV and AIDS*

Dr. Ross Hewitt was called by plaintiff as an expert in the diagnosis and treatment of AIDS and research regarding HIV and AIDS. Defendants accepted his qualifications by also using Dr. Hewitt as their expert. Dr. Hewitt has been Director of AIDS Services at the Erie County Medical Center ("ECMC") since 1988.

Dr. Hewitt testified that AIDS is a syndrome characterized by complications indicative of an underlying immune deficiency. The viral agent identified with AIDS is known as HIV. It was identified in late 1983 and was confirmed in 1984. The virus invades the T4 cell, which is a key cell in the human body's immune system. Over time, the number and function of these cells decline as the virus progresses. Serious complications can occur when an infected individual's T-cell count drops below 200. The most common complications are: pneumocystis pneumonia (non-contagious but potentially fatal), chronic viral infections, bacterial infections, tuberculosis ("TB"), meningitis, lymphoma, and kaposi sarcoma. Technically, an HIV+ person is not diagnosed or described as having AIDS until she is experiencing one or more of these complications.

Louise Nolley's T-cell count never dropped below 300 during her three confinements at the ECHC. Nor did Ms. Nolley develop the complications that would lead her to being diagnosed as having AIDS. Nurse O'Malley was aware that HIV+ inmates are only at risk in the general population when their T-cell count drops below 200. She could have obtained Nolley's T-cell count from Dr. Hewitt at any time during Nolley's confinements but did not do so.

An infected person may be HIV+ for as long as ten years before developing the full-blown complications of AIDS. Even persons with AIDS generally do not require hospitalization unless some acute complication of AIDS develops. Unfortunately, there is no known cure for the disease.

There are only five known ways of transmitting the HIV virus: (1) sharing needles with an infected person; (2) having intimate sexual contact with an infected person; (3) carrying a developing fetus or breast-feeding a newborn; (4) receiving a transfusion of tainted blood or blood products; and (5) in rare circumstances, by blood-to-blood contact initiated through percutaneous cuts. AIDS cannot be transmitted by books, casual contact, being present in the same room as an infected person, toilet seats, door knobs, air conditioning, coughing, sneezing, urine, feces, sputum, nasal secretions, saliva, sweat, tears, or vomit. It certainly cannot be transmitted by attending church with an infected person or by sharing books with him or her.

Sometime in the fall of 1986 or 1987, Dr. Hewitt gave a presentation on AIDS at ECHC to some of the administrative staff of the facility. This presentation was attended by O'Malley and Dray. During that presentation, Dr. Hewitt explained the five known means of transmitting HIV and AIDS, and presented an overview of the disease which consisted of the same information provided in his trial testimony. This testimony is consistent with the findings of the National Center for Disease Control ("CDC"). The knowledge concerning the transmission of HIV and AIDS has not changed since the time of his presentation.

Defendant O'Malley knew of the CDC's findings about the transmission of HIV in 1986 and 1987 and discussed these findings with Dray and with Deputy Judith Lips. Dray received publications about the transmission of HIV, which he made available to his staff. Sheriff Higgins also sent a memo to Dray in late 1987, which emphasized that AIDS could not be spread by casual contact. That memo contained a 1987 publication of the U.S. Department of

Justice entitled "AIDS and the Law Enforcement Officer: Concerns and Policy Responses." This publication was also received by O'Malley. As a result, both defendants Dray and O'Malley knew by 1987 that AIDS could not be transmitted by casual contact. Nevertheless, Dray, in his testimony, said that he did not believe the information he had received about the limited way in which HIV could be transmitted.[1] He believed that HIV could be transmitted through saliva, tears, spit, mucus, urine and feces, by casual contact, by plaintiff using the typewriter in the law library, and even by coming into contact with plaintiff's personal items but not plaintiff.

Dr. Hewitt testified that a drug known as AZT, which first became available in September, 1987, is used to combat HIV. AZT works by slowing down the process of HIV replication. It is necessary to take AZT every four hours because, by then, it is effectively gone from the bloodstream. Missing an entire day's dose of AZT can lead to uncontrollable replication of the virus, which could have long-term, serious consequences for an HIV+ person.

After his one presentation to ECHC administrators in 1986 or 1987, the defendants did not again solicit Dr. Hewitt's assistance, even though he was available to train ECHC staff. Therefore, the only training of staff at ECHC about AIDS was in-service training provided by Deputy Lips for newly hired employees.

### III. Universal Precautions

Since 1987, the CDC has recommended that universal precautions replace a policy of special precautions in dealing with HIV+ inmates. Universal precautions are a system of infection-control that assumes that you cannot identify all persons who are potential carriers of blood-borne diseases. Staff are urged to take appropriate precautions with *all* inmates, rather than inmates identified as HIV+, to prevent blood-to-blood contact. The population in the ECHC facility changes frequently, and it is impossible for the staff to know which inmates are infected with HIV. Nurse O'Malley admitted that at any given time, in addition to the inmates identified as being HIV+, there are inmates in the general population who are HIV+ or have AIDS. Thus, ECHC's policy of using special precautions with inmates known to be HIV+ is less effective than universal precautions in protecting staff from potential infection by HIV+ inmates because it fails to cover inmates in the general population who may be HIV+ or have AIDS.

Other correctional facilities have for some time practiced a system of universal precautions. Since December, 1988, for example, the New York State Department of Correctional Services ("DOCS") has followed the policy of universal precautions in New York State correctional facilities. DOCS stopped isolating HIV+ inmates from the general population in 1987. Defendant O'Malley recommended to defendant Dray that the ECHC follow universal

1. The following exchange between the court and Mr. Dray is very telling in this regard:
 Court: Well now, you are familiar with the material, you've gone over the material that we've discussed here in court about the way—the limited way in which this virus can be transmitted?
 Dray: I am aware as anybody can be. And reading it.
 Court: But in listening to your testimony, at least that I had the understanding that you believe in spite of that, that you are still suspicious that there may be some untoward incident, and that the facility could be liable?
 Dray: I am, your Honor. I am, and I've begun watching it closely for five or six years, and just recently a poor dentist is accused of giving his clients—infecting them with HIV. We were—

 Court: Well, I mean, the—the prisoners in the general population are not doing dental work and/or [do] not have similar tools?
 Dray: Right, but we have no control over them sharing a plate, sharing a meal, drinking out of the same cups.
 [Court:] But see you just—have you read the material about that, and we had a doctor here that told us that the disease cannot be transmitted that way?
 Dray: I read it, I've heard it.
 Court: So that as I understand it, what you're telling me, is that you're substituting your laymen's [sic] judgment for that of the best medical information you can get, is that right?
 Dray: I hate to admit that, but I guess I am.
 Dray, Oct. 16, 1990 at 110–11.

precautions.[2]

## IV. *The Red Sticker Policy*

During Louise Nolley's three confinements, she was subject to a written ECHC policy and procedure, promulgated as a general order by Sheriff Higgins, known as the "red sticker alert." *See* Trial Exhs. 1–4. This alert was developed by defendants O'Malley and Dray in 1986. Tr.Exh. 1. It was reissued in revised form on November 25, 1987. Tr.Exh. 4. This revised order is still in effect today.

The purpose of the red sticker alert is to ensure the safety of staff by identifying inmates known to be or suspected of suffering from contagious or infectious diseases.

> The use of the RED STICKER will alert the Clerks, Search/Change Area Deputy, Housing Area Deputy, Medical Department, Transportation Division and other personnel who might come in contact with the [contagious] inmate, to exercise additional precautions.

Tr.Exh. 4 at 2. A red sticker was affixed on intake to plaintiff's paperwork, clothing bag, court papers, cell card, and other items. It was even affixed to plaintiff's cash record index card, which was seen by civilian personnel assigned to handle the personal property of plaintiff—her wallet, belt, change, keys, etc.—but who never came in physical contact with Ms. Nolley. Thus, the red sticker was seen by dozens of persons, many of whom may never have had any close contact with plaintiff.

The red sticker policy was not always in effect. It was developed in 1986 "when AIDS became the epidemic that was terrorizing everybody in the business, that we had to get and sit down and [write] policy and procedure." Dray, Oct. 16, 1990, at 19. *See also* Higgins, Oct. 17, 1990, at 115–16. Prior to the red sticker policy, ECHC simply isolated inmates with infectious diseases. The deputies would be told that a particular inmate was isolated and precautions should be taken, but they would not be told what disease the inmate was carrying.

On its face, the red sticker does not identify any particular disease and is used whenever an inmate is suspected or known to be carrying an infectious or contagious disease, including HIV+, AIDS, TB, hepatitis, chicken pox, measles, or syphilis. *See* Tr.Exh. 4. In practice, however, plaintiff argues that the red dot revealed to staff and other persons who saw it that Louise Nolley was HIV+ or had AIDS. This is a central contention in the case and must be carefully evaluated.

There is no question that the red sticker policy was developed, not in response to contagious diseases in general, but specifically in response to the hysteria over HIV and AIDS. Sheriff Higgins, when testifying about the development of the general order requiring red stickers, stated:

> Higgins: But when this came out—when the AIDS came out and the fear and the excitement and suspicions and—of all the officers both in the holding center and in the street and everybody that is handling these people, we had to address this specifically.
>
> Coleman: So it's fair to say, sir, that although these orders speak generally of contagious diseases, the principle [sic] focus of this was AIDS, right?
>
> Higgins: I would say that's a fair evaluation.
>
> Coleman: It's fair to say also that it was understood as such by your staff, isn't it?
>
> Higgins: Yes, ma'am.

Higgins, Oct. 17, 1990, at 116. *See also* Dray, Oct. 16, 1990 at 19; O'Malley, Oct. 15, 1990, at 35–36.

It also appears that staff people and others who saw the red dot either knew or strongly suspected that Ms. Nolley was HIV+. Ms. Nolley testified that an inmate trustee named Leroy who worked in the clothing room, after seeing the red dot, asked her if she had AIDS or something contagious. Nolley, Aug. 21, 1990, at 47. On a trip to court in Cheektowaga a matron named Vi saw the red dot and told Nolley that meant she had AIDS. When

---

2. As of today, ECHC has instituted some train- ing for staff in the use of universal precautions.

Nolley complained of this statement to the judge, on her next visit the matron informed Nolley's transporting officer, Deputy Lonnie Williams, that Nolley had AIDS. Plaintiff testified that Deputy Williams told plaintiff's cousin, Layna Williams, that plaintiff had AIDS. Deputy Williams denied this. Nevertheless, Nolley testified, Layna Williams subsequently asked plaintiff if she was okay. *Id.* at 48–51. Deputy Williams later admitted, with respect to a different red-dotted inmate he was transporting, that he pressed Undersheriff Payne to confirm whether that inmate had AIDS. He did so because he was fearful of AIDS. Williams, Oct. 16, 1990 at 146–48. On yet another occasion, plaintiff was being transported with another inmate who asked her for a cigarette. One of the transporting deputies denied the inmate's request, stating that plaintiff had AIDS. Nolley, Aug. 21, 1990 at 53–59, 144.

Plaintiff has made a compelling case that the red stickers placed on her documents and other items revealed her HIV status to non-medical ECHC staff and others. This falls short of proving that a red dot reveals to every person who sees it that a particular inmate is HIV+. Indeed, plaintiff cannot deny that many non-HIV inmates were red-dotted. This fact, however, may not be critical for this case. Based on all the evidence, the court finds that the red stickers placed on *Ms. Nolley's* items disclosed to non-medical ECHC staff and others that Ms. Nolley was HIV+.

## V. *Segregation*

During each of the confinements at issue in this case, plaintiff was segregated from the general inmate population in the five-cell ward known as Female Delta. Three of the cells in the ward are used principally for confinement and observation of inmates who are suicidal or who have demonstrated severe psychiatric problems or mental illness. The other two cells are used for inmates with infectious or contagious diseases who, in the judgment of the medical department, do not require solitary isolation. Inmates with highly infectious *airborne* diseases such as TB, chicken pox, or measles are also segregated from the gen-

eral population, but in single cells in a different part of the jail than Female Delta. All five inmates in Female Delta eat together and share a lounge/television area and shower facilities. They have frequent contact with each other. Their movements are monitored from a control area adjacent to the pod.

Louise Nolley was assigned to Female Delta upon intake during each of her three confinements and remained there for the duration of her stays. The decision to segregate her from the general population was made by the medical department. *This decision was made solely on the basis of her HIV status.* Once plaintiff was so assigned, her segregation was never reviewed by the medical department nor by any other administrator at the ECHC. It was automatically renewed during Ms. Nolley's 1989 and 1989/90 confinements. Plaintiff was never afforded an opportunity to contest her segregation. Other administrative or disciplinary segregation decisions are appealable. Dray, Oct. 17, 1990, at 9; Lips, Oct. 15, 1990, at 161. *See also* Tr. Exhs. 20, 21 (inmate handbooks).

The decision to segregate HIV+ inmates is made pursuant to General Order 87–14, Tr.Exh. 4, promulgated by Sheriff Higgins in revised form on November 25, 1987, and still in effect today. This same order was discussed above as the "red sticker alert." Sheriff Higgins drafted General Order 87–14 on the recommendations of a staff committee which included Nurse O'Malley. Before recommending segregation, O'Malley spoke with Dr. Maddi, the ECHC Chief Physician at that time, who recommended that inmates suspected or known to be HIV+ be isolated from the general population. When the 1986 version of this order was issued, the ECHC had only one or two known AIDS cases but had already begun isolating such inmates on the recommendation of Dr. Pietrak, who was Dr. Maddi's predecessor. For some time, the ECHC had a practice of isolating inmates known or suspected of having other infectious or contagious diseases such as TB, hepatitis, herpes, syphilis, measles, and chicken pox.

General Order 87–14, to the extent it calls for automatic segregation of HIV+ inmates, cannot be reconciled with ECHC Medical Policy and Procedure HCM 23.00.-00, issued in December, 1989, which states:

> Housing decisions, in the Erie County Holding Center, will *not be* made solely on the basis of the protected individual's HIV status. Special housing decisions can be made, however, for medical reasons or for the safety and security of the facility and the persons therein, *in the same manner as any inmate housed in general population.*

Tr.Exh. 30J at 3 (emphasis in original). HCM 23.00.00 does allow for segregation of HIV+ inmates, but only after a determination that "the medical condition of the protected individual is 'at risk' in general population housing or if medical needs or treatment indicate" or "[i]f a protected individual is behaviorally disruptive and making threatening statements/gestures due to his [or her] HIV status...." Tr.Exh. 30J at 3.[3] None of these findings was made in Louise Nolley's case.

Defendants have offered several reasons to support their isolation policy for HIV+ inmates. The first reason ECHC isolates HIV+ inmates is to protect the non-HIV general inmate population from the possibility of exposure to the virus. This purpose is undercut by ECHC's policy of housing HIV+ inmate with non-HIV inmates in Female Delta. In the court's view, it would appear that the prospects for accidental transmission of HIV to non-HIV inmates are greater in Female Delta than in the general population, given the volatility of the inmates housed there. *See infra* (discussing conditions in Female Delta). Louise Nolley testified to instances where an inmate with whom she was housed tried to commit suicide by cutting herself with her dentures. ECHC staff subsequently asked Ms. Nolley to take the inmate's den-

tures from her should she contemplate another attempt at suicide. Ms. Nolley also was approached by a Female Delta inmate to engage in homosexual activity.[4]

Defendants also argue that Louise Nolley was isolated to protect her from contracting opportunistic viruses from the general inmate population. The court finds this argument unsupported by the record for two reasons. First, if defendants' purpose was to protect Ms. Nolley, the decision to house her in close proximity with inmates *known* to carry communicable diseases was peculiar indeed. Second, the court heard expert testimony that an HIV+ inmate is not at risk until their T-cell count drops to a level below 200. Louise Nolley's T-cell count never dropped below 300—a safe level—during any of her three confinements. Nurse O'Malley was aware of these facts, yet never inquired as to Ms. Nolley's T-cell count to determine if she, in fact, would be at risk in the general population. In other words, there was never a finding pursuant to HCM 23.00.00 that "the medical condition of the protected individual [wa]s 'at risk' in general population housing or [that] medical needs or treatment indicate[d]" segregation for Ms. Nolley.

Finally, defendants argue that HIV+ inmates are isolated because of their concern that inmates might react violently to the presence of such an inmate in their midst. Defendant Dray admitted that this was merely a concern; he testified that there had never been such an incident at ECHC. He knew of no such incidents in other correctional facilities. The court finds that this concern, even if valid and not wholly speculative, does not support ECHC's practice of *automatically* isolating HIV+ inmates. Since, according to defendants' theory, it is the other inmates' knowledge of an HIV+ inmate in their midst that would trigger a violent response, if an inmate is

---

3. HCM 23.00.00 was developed by Deputy Lips with the approval of defendant Dray, and after consultation with the New York State Commission of Correction's ("CoC") attorney. *See* Tr. Exhs. 17H, 17F; Lips, Oct. 15, 1990, at 132–37; Dray, Oct. 16, 1990, at 77.

4. The court is not expressing the opinion that transmission of the HIV virus was likely to occur as a result of these instances. The court merely notes them to indicate that blood-to-blood contacts between inmates may have been *more* likely to occur in Female Delta than in the general population.

not known to be HIV+ by the general population, there would be no risk of violence. Defendants admit that there are HIV+ inmates in the general population that *neither* ECHC nor the general population inmates know about. There is no difference in terms of security between this type of inmate and an inmate known by ECHC but unknown by the general population to be HIV+.

The court also finds that defendants' alleged concern with violence is undercut by the fact that Ms. Nolley was intentionally housed with inmates known to be psychologically unstable and often violent, although Mr. Dray testified that those housed in Female Delta were only violent toward themselves. Inmates known to be violent toward others are isolated completely, he stated.

Plaintiff argues that the ECHC, by segregating Louise Nolley in Female Delta, revealed to staff and other inmates that plaintiff was HIV+ or had AIDS. There is little question that Female Delta was known by staff and at least some of the ECHC inmate population to house HIV+ inmates. One inmate, for example, testified that several sheriff's deputies told her that Louise Nolley had AIDS. It is also clear that ECHC inmates going to sick call in the Medical Department must pass by Female Delta. They can see into the unit and communicate with inmates housed there. These factors might lead all those who passed Female Delta to assume that each inmate therein had AIDS. This assumption would be wrong because Female Delta also housed non-HIV inmates, but it would not be significantly off the mark given the small number of inmates confined there. Thus, although the court finds that segregation in Female Delta did not conclusively reveal plaintiff's HIV status to ECHC inmates, it did strongly suggest to these persons that she was HIV+. The question whether Ms. Nolley's isolation in Female Delta revealed her HIV status to ECHC staff will be discussed more fully below. *See infra* § II(A).

## VI. *Conditions of Confinement*

Plaintiff also complains that her confinements amounted to cruel and unusual punishment. As noted, plaintiff was segregated for the duration of each of her confinements in the Female Delta Medical Pod. Medical treatment was not provided in Female Delta, however, but only in the Medical Department. Plaintiff testified that at times she did not get her medicine, especially her AZT, or received it late.

The overall conditions in Female Delta were extremely stressful. Three of the five cells in the unit were used to confine inmates who were suicidal or who demonstrated severe psychiatric problems. Louise Nolley was under constant pressure from these inmates. As plaintiff testified, "[i]t was a lot of pressure. It was hectic and it was crazy. It was depressing." Nolley, Aug. 21, 1990, at 59–60.

People were attempting to commit suicide. It was just never quiet. Somebody was always crying or trying to hurt theirselves [sic] and they didn't shut their doors, you know, they couldn't lock in their rooms because the officers had to be able to get right into their cells if anything happened, so they were always running around, even at night when I could lock in they could come out of their cells and be running around and asking for cigarettes and trying to kill theirself [sic], and officers always had to come up there to rescue one of them and it would take a while. It was a mental ward.

*Id.* at 59–60.

During her 1988 and 1989 confinements, plaintiff was housed with an inmate who was accused of murdering her four children. This inmate attempted suicide on a number of occasions, including at least one instance where she used her dentures to attempt to cut her wrists. After that, sheriff's deputies asked plaintiff to take her dentures away from her if she spoke of suicide. The inmate frequently described the murder of her children in gruesome detail, even while plaintiff was eating. Often the staff asked the plaintiff to give her medicine, to take spoons away from her (which she attempted to swallow), or to do

other things which plaintiff claims the staff was afraid to do.

During her 1989 confinement, plaintiff was housed with another inmate who was accused of murdering her child. This inmate also spoke frequently about the murder. Plaintiff testified that staff asked her to give this inmate medication too. In the 1989 and 1989/90 confinements, plaintiff was housed with an inmate accused of helping her boyfriend commit murder. This inmate also spoke graphically of her crime. Another inmate housed with plaintiff was homosexual and approached plaintiff for sex on several occasions. Still another inmate repeatedly ate out of the garbage. Plaintiff had to get her out of the garbage and place it outside the door where she could not get to it.

Defendant Dray was fully aware of the distressing conditions in Female Delta. He acknowledged that inmates should not be subjected to such behavior.

## VII. Law Library and Religious Services

Throughout her 1988 and 1989 confinements, plaintiff was not permitted direct access to the ECHC law library, despite her repeated requests. The library is available to female general population inmates once each week on Friday mornings. During her 1989/90 confinement, plaintiff was allowed in the law library on four occasions after she requested to use a typewriter, but was required to wear plastic gloves while typing and was not permitted to touch the law library's books. In June, 1988, plaintiff sent a letter to defendant Dray asking for use of the law library. Dray sent an official to explain to plaintiff that she would not be allowed to go the law library but could request the staff librarians to copy specific cases to be delivered to her in Female Delta. Plaintiff was also denied face-to-face contact with inmate law clerks. Although plaintiff was able to correspond with inmate clerks and staff librarians, the process of being forced to request specific materials without being able to conduct general research caused undue delay. Many times the materials she needed would not be delivered because the librarians did not understand what she wanted. Other non-HIV inmates who were housed in Female Delta, even those with red stickers, were permitted to use the law library on the same basis as those in the general population.

During her 1988 and 1989 and most of her 1989/90 confinements, plaintiff was not permitted to attend Catholic mass with inmates from the general population, even though she identified herself as a Catholic and frequently asked for permission to attend. She was finally granted permission to attend communal services during the last weeks of her 1989–90 confinement. The Catholic chaplain was permitted to meet with plaintiff in Female Delta during each of her confinements to distribute communion and hear her confessions, albeit not in a private place. He testified, however, that it was also very important for a Catholic to attend church. Other inmates from Female Delta were permitted to attend mass.

During her confinements, plaintiff was not permitted access to the general library maintained at the ECHC. Instead of being permitted to borrow any book from the library, plaintiff was brought books which were torn, outdated, and marked with an "X" on the cover. After she was finished with them, the books were thrown away.

ECHC policy and procedure HCM 10.09.-01, effective December 10, 1987, provides that the decision to deny an inmate housed in Female Delta access to the law library or other ECHC programs is to be made by the Medical Department. Tr.Exh. 25. HCM 23.00.00, adopted in December, 1989, states unequivocally that:

> No inmate housed in the Erie County Holding Center will be denied access to programs based solely on HIV status. Protected individuals will have access to programs in the same manner as the general population except as required by the individual's medical condition or for the protection of the safety and security of the inmate or facility.

Tr.Exh. 30J at 3. Dray testified that he discussed plaintiff's access to programs with defendant O'Malley, and claimed that

she made the decision to deny plaintiff access to ECHC programs. O'Malley denied this. It was her opinion that plaintiff did not pose a medical threat to anyone at ECHC. Sheriff Higgins testified that it was not his intention to deny HIV+ inmates access to the law library or church services.

The court finds that the decision to deny plaintiff access to the law library and other ECHC programs was the result of an *ad hoc* policy implemented by defendant Dray. Dray testified that the fact plaintiff was isolated in Female Delta, to his mind, meant that she could not go to programs with the general population. He said that he denied plaintiff access to the law library and other facilities based solely on the fact that plaintiff was HIV+. ECHC policy and procedures were not followed in plaintiff's case.

## VIII. *Rehabilitation Act*

Plaintiff contends that she was denied access to services and activities at the holding center in violation of the Rehabilitation Act, 29 U.S.C. § 794. Defendants have admitted that in the years 1988, 1989, and 1990, the County of Erie received approximately $779,060.00 in federal funds for the detention of federal prisoners at the ECHC.

## DISCUSSION

## I. THE RED STICKER POLICY

### A. *Article 27–F of the Public Health Law and CoC Regulations*

Plaintiff complains that by placing red stickers on Louise Nolley's intake card, cash record index card, clothing bag, court papers, cell card, and other items, defendants violated article 27–F of New York State's Public Health Law, N.Y.Pub.Health Law § 2780 *et seq.* (McKinney's 1991 Supp.), State Commission of Correction ("CoC") regulations adopted pursuant that law, and ECHC policy and procedure. Her complaint, however, is limited to her 1989/90 incarceration and her request for injunctive relief because article 27–F only became effective February 1, 1989.

Article 27–F, entitled "HIV and AIDS Related Information," "requires that HIV related information be kept confidential and permits disclosure only in narrowly defined need-to-know circumstances...." *V. v. State,* 566 N.Y.S.2d 987, 988 (Ct.Cl. 1991). Pursuant to article 27–F, the CoC issued regulations applicable to all local correctional facilities, defining the circumstances under which confidential HIV-related information can be revealed. 9 N.Y.C.R.R. § 7064 (1991). The regulations became effective October 24, 1989. To comport with these regulations, the ECHC issued policy and procedure HCM 23.00.00 in December, 1989, after consulting with the CoC.

Before the court can address the merits of plaintiff's claims, the court must first determine whether article 27–F provides a private cause of action for plaintiff. There has been one decision to date addressing this precise question. *V. v. State,* 566 N.Y.S.2d 987. In that case, Judge Corbett, after reviewing the legislative history of the act and applying the test set forth in *Sheehy v. Big Flats Community Day, Inc.,* 73 N.Y.2d 629, 543 N.Y.S.2d 18, 20, 541 N.E.2d 18, 20 (1989) and *Burns, Jackson, Miller, Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 716, 451 N.E.2d 459, 463 (1983), held that claimant, an inmate housed at Attica Correctional Facility whose HIV confidentiality had allegedly been breached,

> qualifie[d] as one of the class for whose benefit Article 27–F was enacted, that recognition of his right to pursue this action would promote the legislative purpose of confidentiality, particularly as articulated by the legislative sponsors and the Governor, and, in further harmony therewith, this right is consistent with the statutory scheme given the reference to Section 12 of the Public Health Law in Section 2783(1)(b).

*V. v. State,* 566 N.Y.S.2d at 989. The court concurs in Judge Corbett's analysis and finds that plaintiff has a private cause of action under article 27–F.

Defendants offer two arguments in support of the red sticker policy. First,

defendants point out that because inmates afflicted with infectious diseases—such as TB, hepatitis, herpes, chicken pox, measles, or syphilis—who are not HIV+ are also subject to being red-stickered, the red sticker policy does not disclose "confidential HIV-related information" about any particular inmate to ECHC staff and others. CoC regulations specifically restrict disclosure of "confidential HIV-related information." 9 N.Y.C.R.R. § 7064.8. That phrase is defined in § 7064.2(g) as follows:

> "Confidential HIV-related information" means any information, in the possession of a person who provides health or social services or who obtains the information pursuant to a release of confidential HIV-related information, concerning whether an individual has been the subject of an HIV-related test, or has HIV infection, HIV-related illness or AIDS, *or information which identifies or reasonably could identify an individual as having one or more of such conditions*, including information pertaining to such individual's contacts.

*Id.* (emphasis added). Thus, pursuant to CoC regulations, if the placement of a red sticker on an inmate's documents and other items identified or "reasonably could [have] identif[ied] an individual" as being HIV+, their HIV confidentiality would have been breached.

As the court found above, the red sticker policy was developed, not in response to infectious diseases in general, but directly in response to the hysteria at ECHC over HIV and AIDS. This was understood by ECHC staff. Accordingly, the presence of a red sticker on an inmate's documents first and foremost suggested (and still no doubt suggests) that the inmate is HIV+. It is also clear to the court that staff people and others who saw the red dot on Ms. Nolley's documents either knew or strongly suspected that she was HIV+. The incidents with inmate trustee Leroy and court matron Vi, as well as the incident where transporting deputies denied the request of another inmate to borrow a ciga-

rette from plaintiff because she had AIDS, indicate to this court that the red sticker revealed plaintiff's HIV status to them. Therefore, the court finds, based on the testimony of plaintiff and others, that the red stickers placed on Louise Nolley's intake card, clothing bag, court papers, cell card, and other items disclosed her confidential HIV-related information to ECHC staff and inmates who were exposed to the stickers.

■ As noted, CoC regulations require confidential HIV-related information to remain confidential. The section entitled "Confidentiality and disclosure," states:

> (a) No person who obtains confidential HIV-related information in the course of providing any health or social service or pursuant to a release of confidential HIV-related information may disclose or be compelled to disclose such information, except to the following: ....

9 N.Y.C.R.R. § 7064.8(a).[5] Defendants' second argument is that, even if a red sticker reveals confidential HIV-related information, it does so only to personnel authorized under § 7064.8 to receive it. Defendants rely on § 7064.8(15), which states that confidential HIV-related information can be disclosed to:

> (15) an employee or agent of a provider of health or social services, including but not limited to the Department of Correctional Services and local correctional facilities, when reasonably necessary to provide supervision, monitoring or administration of services *and* when these employees or agents have access in the ordinary course of business to records relating to the care, treatment, or provision of a health or social service, *and* in accordance with such provider's regulations promulgated in accordance with article 27–F of the Public Health Law. Disclosure to an employee or agent of a local correctional facility pursuant to this paragraph shall be consistent with section 601 of the Correction

---

**5.** The ECHC and its staff provides a "health or social service" under these regulations. *See id.,* § 7064.2(h).

Law and Part 7033 of this Chapter *and* shall be authorized *only* when such disclosure is necessary to:

(i) enable the chief administrative officer to appropriately maintain custody and supervision of the protected person *or* provide for the safety and protection of the protected person *or* provide for the safety and protection of staff, other inmates, or the facility; *and*

(ii) the medical director reasonably believes that *without disclosure* circumstances will exist creating a *significant risk* of contracting or transmitting HIV infection.

9 N.Y.C.R.R. § 7064.8(a)(15) (emphasis added). Plaintiff contends that the red stickers reveal confidential HIV-related information to persons who are not employees or agents of ECHC. Plaintiff further contends that even if disclosure of her HIV status were limited to transportation deputies, guards, and other non-medical ECHC staff, such disclosure is not permitted under this section. The court agrees.

As an initial matter, defendants do not contend that *inmates* who saw Louise Nolley's red stickers and concluded she was HIV+ are authorized to receive this information under article 27–F. The court heard testimony that at least one inmate, upon seeing the red stickers, concluded that plaintiff had AIDS. Defendants' second argument must fail on this ground alone.

The court also concludes, based on a plain reading of the statute and regulations, that transportation deputies, change guards, and other non-medical ECHC staff were not intended, as a general policy, to be privy to confidential HIV-related information under § 7064. *See V. v. State*, 566 N.Y.S.2d at 989. Section 7064 has been promulgated by the CoC pursuant to § 45(6) of the New York Correction Law and § 2786 of the Public Health Law, which is part of article 27–F. Section 2786(2)(a) directs the chairperson of the CoC to issue regulations pursuant to §§ 2782(1)(n) and (*o*), determining which employees of local correction facilities,

§ 2782(1)(n), and the Commission of Correction, § 2782(1)(*o*), "may, in the ordinary course of business of the agency or provider, be authorized to access confidential HIV related information...." N.Y.Pub. Health Law § 2786(2)(a). Section 2782 of the Public Health Law states that "[n]o person who obtains confidential HIV related information in the course of providing any health or social service ... may disclose or be compelled to disclose such information, except to the following," and then includes a list of sixteen categories of persons who may be disclosed such information. N.Y.Pub.Health Law § 2782(1). The only section applicable to employees of local correctional facilities is found at § 2782(1)(n), which permits disclosure to:

*a medical director* of a local correctional facility as defined in [§ 40] of the correction law, in accordance with [§ 2786(2)(a) ], to the extent the medical director is authorized to access records containing such information in order to carry out his or her functions, powers and duties with respect to the protected individual....

N.Y.Pub.Health Law § 2782(1)(n) (emphasis added). Thus, there is no mention in article 27–F authorizing disclosure of HIV-related information to non-medical correctional facility personnel. Indeed, one of the lead sponsors of article 27–F in the legislature stated in a letter to the Governor,

Beyond disclosure of HIV-related information to medical personnel, it is the intent of this legislation to only allow disclosures of such information within correctional facilities to those employees who normally have access to such medical information in the course of carrying out their work-related responsibilities. Broader provisions were considered and rejected.

*See V. v. State*, 566 N.Y.S.2d at 989. Therefore, the court does not read § 7064.-8(a)(15) as permitting blanket disclosure of confidential HIV-related information to transportation deputies, change guards, and other non-medical ECHC staff.

There is also no provision in the local regulations authorizing non-medical ECHC staff to receive HIV-related information. ECHC policy and procedure HCM 23.00.00, Tr.Exh. 30J, adopted pursuant to article 27–F, reaffirms the CoC's policy of ensuring the maximum confidentiality of information related to an inmate's HIV status. For example, under section (A)(1), the regulations state: "The medical records and/or condition of any inmate housed in the Erie County Holding Center is strictly confidential." HCM 23.00.00(A)(1), Tr.Exh. 30J at 2.

In addition to the court's previous finding that the red stickers on Louise Nolley's items disclosed her HIV status to non-medical ECHC staff, *see supra*, the court now finds that such disclosure was not authorized under § 7064.8(a)(15). The sole purpose behind disclosure of confidential HIV-related information to these staff people is to enable them to take precautions against exposure to the virus. This purpose seems to have been contemplated in § 7064.-8(a)(15)(i) upon a finding that "disclosure is necessary to ... enable the chief administrative officer to ... provide for the safety and protection of staff...." 9 N.Y.C.R.R. § 7064.8(a)(15)(i). The regulations, however, also require a finding by the medical director that "without disclosure circumstances will exist creating a significant risk of contracting or transmitting HIV infection." 9 N.Y.C.R.R. § 7064.8(a)(15)(ii). There is no evidence that such a finding was ever made. Moreover, given the efficacy of universal precautions in protecting ECHC staff from the legitimate danger of being exposed to the HIV virus, a fact that was uncontroverted at trial, the court finds there is no need to disclose to transportation deputies and other non-medical ECHC staff which inmates are HIV+ in order to protect them from exposure. Because there are likely to be several unidentified HIV+ inmates at ECHC at any given time, a fact admitted by Nurse O'Malley, handling *all* inmates as if they were HIV+ is more protective of Holding Center staff than informing them of known HIV+ inmates. Further, defendants have admitted that, even where the HIV status of an inmate is known, no protections greater than advised by universal precautions are taken in handling that inmate. Thus, disclosure of confidential HIV-related information is not necessary to provide for the safety and protection of these ECHC staff members, 9 N.Y.C.R.R. § 7064.8(a)(15)(i); similarly, failure to disclose the HIV status of known HIV+ inmates to them cannot, as a general matter, create a "significant risk of contracting or transmitting HIV infection." 9 N.Y.C.R.R. § 7064.8(a)(15)(ii). Therefore, disclosure of confidential HIV-related information to transportation deputies, change guards, and other non-medical ECHC staff is a violation of article 27–F.

Accordingly, the placement of red stickers on plaintiff's documents and other items during her 1989/90 confinement violated article 27–F of the New York State Public Health Law. N.Y.Pub.Health Law § 2780 *et seq.*

## B. *Constitutional Right to Privacy*

Plaintiff also challenges ECHC's practice of placing red stickers on Louise Nolley's documents and other items as violative of her constitutional right to privacy. The right plaintiff asserts is the right to be protected against unwarranted disclosure of her medical condition; namely, her HIV status. Determining whether this right exists is our first task. If there is such a right, the court must then determine if ECHC violated this right. Finally, even if the answer to this latter question is yes, the court must then decide whether the red sticker policy is nevertheless "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987).

The starting point for our analysis must be the Supreme Court's unanimous decision in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Whalen*, plaintiffs challenged a New York statute that directed the establishment of a centralized database of names and addresses of individuals who obtained drugs by prescription for which both a legal and illegal market existed. Plaintiffs argued that the accumulation of this data, and its potential

release to the public, violated their constitutional right to privacy. *Id.* at 600, 97 S.Ct. at 877. After noting that the right to privacy discussed in prior Supreme Court decisions is based on "the Fourteenth Amendment's concept of personal liberty and restrictions upon state action," *id.* at 598 n. 23, 97 S.Ct. at 876 n. 23 (quoting *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973)),[6] the Court identified two interests protected by this right. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* at 599–600, 97 S.Ct. at 876–77 (footnotes omitted). The Court found, however, that given the confidentiality protections embraced in the law, the New York statute did not infringe upon these interests sufficiently to establish a constitutional violation. *Id.* at 603–04, 97 S.Ct. at 878–79.

*Whalen*'s holding that privacy embraces the "individual interest in avoiding disclosure of private matters" was affirmed by the Court in *Nixon v. Administrator of Gen. Serv.,* 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977), decided the same term. *Nixon* involved a suit by the former President to strike down a congressional statute authorizing archival review of a mountain of Presidential materials. Balancing interests, the Court held that given the important public interest in preservation of the President's papers, the appellant's status as a public figure, and the limited intrusion of the archival screening,[7] the President's constitutional right to privacy was not abridged. *Id.* at 465, 97 S.Ct. at 2801.

The Court has continued to affirm the privacy interest in non-disclosure of personal matters. In *New York v. Ferber,* 458 U.S. 747, 774, 102 S.Ct. 3348, 3364, 73 L.Ed.2d 1113 (1982), the Court found constitutional a New York criminal statute which prohibited distribution of child pornography. The Court supported its holding that States "are entitled to greater leeway in the regulation of pornographic depictions of children," *id.* at 756, 102 S.Ct. at 3354, by noting the harm caused to children exposed in photographs and films depicting them engaged in sexual activity. *Id.* at 759, 102 S.Ct. at 3356. Distribution of this material violates the child's interest in avoiding the disclosure of personal matters, the Court held. *Id.* at 759 n. 10, 102 S.Ct. at 3355 n. 10 (citing *Whalen v. Roe,* 429 U.S. at 599, 97 S.Ct. at 876). In *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 769–70, 109 S.Ct. 1468, 1479–80, 103 L.Ed.2d 774 (1989), the Court again cited *Whalen* with approval.

Numerous courts since *Whalen* have held that the constitutional right to privacy includes protection against unwarranted disclosure of one's medical records or condition. *See Schaill ex rel. Kross v. Tippecanoe County Sch. Corp.,* 864 F.2d 1309, 1322 n. 19 (7th Cir.1988); *In re Search Warrant (Sealed),* 810 F.2d 67, 71 (3d Cir.), *cert. denied sub nom., Rochman v. United States,* 483 U.S. 1007, 107 S.Ct. 3233, 97 L.Ed.2d 739 (1987); *Trade Waste Management Ass'n, Inc. v. Hughey,* 780 F.2d 221, 233–34 (3d Cir.1985); *Doe v. Borough of Barrington,* 729 F.Supp. 376, 382 (D.N.J.1990). Other courts have recognized that the right protects non-disclosure of analogous personal information. *See, e.g., Pesce v. J. Sterling Morton High Sch. Dist. 201,* 830 F.2d 789, 795–97 (7th Cir. 1987); *Fadjo v. Coon,* 633 F.2d 1172, 1175 (5th Cir.1981). One court, reviewing the law for qualified-immunity purposes, stated that "as of June 1983 a majority of courts considering the question had concluded that a constitutional right of confidentiality is implicated by disclosure of a broad range of personal information...." *Borucki v. Ryan,* 827 F.2d 836, 846 (1st Cir.1987).[8]

---

**6.** *See also Carey v. Population Serv. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977).

**7.** The Court noted that the President's materials were to be screened by archivists with an unblemished record for discretion, and truly private materials were to be returned to the President. *Id.* at 460, 462, 97 S.Ct. at 2798, 2800.

**8.** In *Borucki,* the court concluded that the constitutional right of confidentiality, as of the time defendant acted, was not "clearly established" for purposes of qualified immunity analysis.

Precisely on point with this case, several courts have held that prison inmates are constitutionally protected from the unwarranted disclosure of their HIV status. *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir.1991); *Inmates of New York State With Human Immune Deficiency Virus v. Cuomo*, 1991 WL 16032 (N.D.N.Y. Feb. 7, 1991); *Rodriguez v. Coughlin*, 1989 WL 59607 (W.D.N.Y. June 5, 1989); *Doe v. Coughlin*, 697 F.Supp. 1234, 1238 (N.D.N.Y.1988); *Woods v. White*, 689 F.Supp. 874, 876 (W.D.Wis.1988), *aff'd without opinion*, 899 F.2d 17 (7th Cir. 1990). In *Harris*, HIV+ inmates in Alabama's State prisons brought a class action challenging Alabama's practice of testing all inmates and segregating those who tested positive for HIV. The district court had sweepingly concluded that prisoners were completely without privacy rights. *Harris v. Thigpen*, 727 F.Supp. 1564, 1571 (M.D.Ala.1990), *aff'd in part and rev'd in part*, 941 F.2d 1495 (11th Cir.1991). The Eleventh Circuit rejected this conclusion and held that "prison inmates, in spite of their incarceration, 'retain certain fundamental rights of privacy.'" *Harris*, 941 F.2d at 1513 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 2592 n. 2, 57 L.Ed.2d 553 (1978)). Although the court found this right to be ill-defined, it stated:

> We nevertheless believe and assume *arguendo* that seropositive [HIV+] prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other inmates, as well as to their families and other outside visitors to the facilities in question.

*Id.*[9]

In *Cuomo*, inmates infected with HIV in New York State prisons filed a class action claiming that the prisons' lack of medical and other services was violative of their rights under the Constitution. Within the context of a discovery dispute over plaintiffs' request for the names or identification numbers of inmates who were known by defendants to be HIV+, the court accepted as uncontested "the proposition that the federal Constitution protects against the unwarranted and indiscriminate disclosure of the identity of HIV-infected individuals and of their medical records...." *Cuomo*, 1991 WL 16032. The court concluded that the identity of HIV+ inmates need not be disclosed for plaintiffs to litigate their case. *Id.* The court also directed authorities to maintain even general information about such inmates (with specific identities redacted) under the tightest confidentiality. *Id.*

In *Rodriguez*, 1991 WL 59607, an inmate transported in a "hygiene suit" enveloping his entire body, brought suit claiming the outfit revealed his HIV status to fellow inmates, who in turn threatened him with bodily harm. Judge Elfvin denied defendants' motion to dismiss, holding that the pleading stated a valid constitutional claim on right to privacy grounds. "Such right precluded New York's corrections officers from disclosing to other inmates that he suffers from AIDS." *Id.*

In *Doe v. Coughlin*, 697 F.Supp. at 1243, the court granted preliminary injunctive relief to HIV+ inmates who complained, *inter alia*, that their transfer to a separate dormitory reserved for HIV+ inmates would reveal their HIV status to other inmates and, subsequently, to the world outside prison. The court based its decision on *both* prongs of *Whalen v. Roe*.

> In the court's view there are few matters of a more personal nature, and there are few decisions over which a person could have a greater desire to exercise control, than the manner in which he reveals [his HIV] diagnosis to others.

---

*Borucki*, 827 F.2d at 839–47. *See also Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 647–48 (10th Cir.1988); *Plowman v. United States Dep't of the Army*, 698 F.Supp. 627, 633–34 (E.D.Va.1988). This court must at some point take up the question of qualified immunity for defendants, but declines to do so now.

9. The court, applying the Supreme Court's *Turner v. Safley* test (discussed below), ultimately found that the Alabama prison system did not unconstitutionally impinge upon these privacy rights, given the countervailing interests of the prison authorities. *Harris*, 941 F.2d at 1521.

*Doe v. Coughlin,* 697 F.Supp. at 1237. The court was especially sensitive to the emotional implications and potential ostracism entailed in notifying others of one's HIV status. "Within the confines of the prison the infected prisoner is likely to suffer from harassment and psychological pressures. Beyond the prison walls the person suffering from AIDS is often subject to discrimination." *Id.* The court concluded that "the prisoners subject to this program must be afforded at least some protection against the non-consensual disclosure of their diagnosis." *Id.* at 1238.

Finally, in *Woods v. White,* 689 F.Supp. at 876, the court denied defendants' motion for judgment on the pleadings where plaintiff had alleged that medical personnel at the Waupun Correctional Institution's Health Service Unit revealed to non-medical staff and other inmates the fact that plaintiff had tested positive for HIV. The court upheld plaintiff's right to privacy, stating:

> Given the most publicized aspect of the AIDS disease, namely that it is related more closely than most diseases to sexual activity and intravenous drug use, it is difficult to argue that information about this disease is not information of the most personal kind, or that an individual would not have an interest in protecting against the dissemination of such information.

*Id.* The court added that it was not necessary to balance plaintiff's right to nondisclosure against a contrary state interest because no such state interest was suggested by defendants. *Id.*

■ This court is persuaded by the reasoning of the above-cited cases and expressly holds that prison inmates are protected by a constitutional right to privacy from the unwarranted disclosure of their HIV status. The cases that have rejected this conclusion are not compelling. *See Baez v. Rapping,* 680 F.Supp. 112, 115 (S.D.N.Y.1988); *Cordero v. Coughlin,* 607 F.Supp. 9, 11 (S.D.N.Y.1984). Both *Baez* and *Cordero* rejected inmates' claims on the grounds that prisoners enjoy only limited privacy rights. *Baez,* 680 F.Supp. at 115; *Cordero,* 607 F.Supp. at 11. The cases cited in support of this hold, however, that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979) (citing *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2539–40, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), and other cases). Prison inmates retain *some* right to privacy. *Harris v. Thigpen,* 941 F.2d at 1512–13; *Kimberlin v. United States Dep't of Justice,* 788 F.2d 434, 439 n. 6 (7th Cir.), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3306, 92 L.Ed.2d 719 (1986). The question is: how much?

■ The Supreme Court's analysis under *Whalen* and subsequent cases has always balanced the state's interest in assembling, *Whalen,* 429 U.S. at 600, 97 S.Ct. at 877, or reviewing, *Nixon,* 433 U.S. at 451–52, 97 S.Ct. at 2794, personal information against the individual's interest in non-disclosure to determine if a constitutional violation of privacy has occurred. Where constitutional violations are alleged by prisoners, however, the Court has struck this balance differently, given its policy of judicial restraint toward review of prison regulations. *See, e.g., Block v. Rutherford,* 468 U.S. 576, 586–89, 104 S.Ct. 3227, 3232–33, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish,* 441 U.S. at 550–51, 99 S.Ct. at 1880; *Jones v. North Carolina Prisoners' Union,* 433 U.S. at 129–30, 97 S.Ct. at 2539–40; *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806. To balance the policy of judicial restraint for prisoners' complaints against the need to protect constitutional rights, the Court has set forth the following test:

> when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2261–62. *See also Thornburgh v. Abbott,* 490 U.S. 401, 404, 109 S.Ct. 1874, 1877, 104 L.Ed.2d 459 (1989); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107

S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Thus, the privacy rights of an inmate must be weighed against the strong deference due prison administrator's judgments in the operation of their prisons. *See Harris v. Thigpen,* 941 F.2d at 1515; *Walker v. Sumner,* 917 F.2d 382, 385 (9th Cir.1990). Our analysis under *Turner* is therefore necessary to answer the question whether Louise Nolley's constitutional right to privacy was violated in this case.

■ The court reaffirms the finding made in section I(A) that ECHC's practice of placing red stickers on plaintiff's documents and other items disclosed her HIV status to staff and inmates who were exposed to the stickers. The question under *Turner v. Safley* is whether the regulation which led to these disclosures was nevertheless reasonably related to legitimate penological interests.

*Turner v. Safley* identified four factors to consider to make this determination:

First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.... Moreover, the governmental interest must be a legitimate and neutral one....

A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates....

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally....

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable....

*Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62 (quoting *Block v. Rutherford,* 468 U.S. at 586, 104 S.Ct. at 3232).

Courts interpreting the first of these factors have held that, although prison officials are due substantial deference, "[p]rison officials must 'put forward' a legitimate governmental interest to justify their regulation ... and must provide *evidence* that the interest proffered is the reason why the regulation was adopted or enforced." *Walker v. Sumner,* 917 F.2d at 385. *See Swift v. Lewis,* 901 F.2d 730, 732 (9th Cir. 1990); *Caldwell v. Miller,* 790 F.2d 589, 598 (7th Cir.1986). The *Walker* court added:

Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point.

*Walker,* 917 F.2d at 386.

Defendants introduced evidence that the purpose for the red stickers is to ensure the safety of staff against the danger of infection from inmates with contagious diseases. This is certainly a legitimate interest, and there is no dispute about that. The question here is whether ECHC's red sticker policy is rationally related to that purpose. The red sticker policy identifies inmates known to be or suspected of suffering from contagious or infectious diseases so that ECHC staff will be alerted to take additional precautions when handling those inmates. One problem with the red sticker policy, however, is that it alerts staff to take precautions only with inmates *known* by ECHC to be carrying infectious diseases, including HIV. The policy does nothing to protect staff from inmates who, unbeknownst to ECHC, are carrying the same diseases. Defendants have admitted that numerous such inmates exist at the holding center. To protect staff against these unknown inmates, ECHC has started to institute a system of universal precautions, whereby staff are directed to take precautions against infection by bloodborne diseases with *all* inmates, not just those bearing the red dot. Thus, the red sticker policy is underinclusive in that it protects staff less effectively than universal precautions.

More importantly, the red sticker unnecessarily identifies inmates with blood-borne diseases [10] because the precautions urged under universal precautions *are exactly the same* precautions urged for inmates bearing the red dot. Thus, the presence of a red dot on an inmate's documents or other items does not rationally further the protection of ECHC staff from the legitimate danger of infection from inmates with contagious diseases.

This conclusion is underscored by jumping to step four of the *Turner* test, which evaluates whether the prison's regulation is an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262.

> [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 91, 107 S.Ct. at 2263. *See also Abbott*, 490 U.S. at 418, 109 S.Ct. at 1884; *Harris v. Thigpen*, 941 F.2d at 1519. Given the efficacy of universal precautions as a ready and, according to uncontroverted testimony, *notably superior* alternative, *see supra*, the court concludes that the red sticker policy is an "exaggerated response" and is not reasonably related to the protection of ECHC staff.

The court also finds that, under the second *Turner* factor, there is no alternative means for inmates to exercise their right to privacy. Once it is lost, it is lost forever. Under the third *Turner* factor, since universal precautions are in the process of being implemented at ECHC, there would be minimal, if any, impact on guards and others to accommodate inmates' constitutional rights by doing away with the red stickers.

Accordingly, as the red sticker policy is not reasonably related to legitimate penological interests, Louise Nolley's constitu-

tional right to privacy was violated by defendants' practice of placing red stickers on her documents and personal items, thereby revealing her HIV status to nonmedical ECHC staff and fellow inmates.

## II. SEGREGATION

### A. *Article 27–F of the Public Health Law and CoC Regulations*

 Plaintiff complains that her confinement in Female Delta revealed her HIV status to unauthorized persons in violation of article 27–F of New York's Public Health Law, and the CoC regulations adopted pursuant to that law. The court has already reviewed this law in some detail in the context of ECHC's red sticker policy. *See supra* § I(A). Under CoC regulations, if the segregation of Louise Nolley released information which identified, or reasonably could have identified, her as HIV+, her HIV confidentiality would have been breached. 9 N.Y.C.R.R. § 7064.2(g). This is the question for the court.[11]

Female Delta is a five-cell ward segregated from the general inmate population. Generally, three of the cells are used to house inmates who are suicidal or have severe psychiatric problems. The other two cells are used for inmates with blood-borne infectious diseases, such as hepatitis or HIV. ECHC staff and at least some inmates from the general population were aware during Nolley's 1989/90 confinement that Female Delta housed HIV+ inmates. Inmates going to the Medical Department on sick call passed by Female Delta. They could see into the unit and communicate with inmates housed there.

As I indicated in my findings of fact, this information, while it did not conclusively reveal plaintiff's HIV status to persons observing her in Female Delta, strongly suggested that she was HIV+. Is this enough, by itself, to have breached plaintiff's HIV confidentiality? This is a diffi-

---

**10.** Staff are urged to take additional precautions for inmates bearing red dots who carry *airborne* diseases, but this information is conveyed separately by the medical staff and is unrelated to the red dot.

**11.** This question is limited to plaintiff's 1989/90 confinement, which postdated the effective date of New York's Public Health Law.

cult question to answer. Plaintiff's case is different from numerous other cases challenging HIV segregation wards in other prisons, *see, e.g., Harris v. Thigpen,* 941 F.2d at 1499; *Doe v. Coughlin,* 697 F.Supp. at 1240 & n. 15, in that Female Delta is an isolation ward not limited to HIV+ inmates. It can therefore not be assumed, as it was in *Harris* and *Doe,* that housing plaintiff in Female Delta automatically breached her HIV confidentiality. Further complicating the question is the fact that ECHC used red stickers to identify plaintiff. As the court has already found, the presence of these stickers alone revealed plaintiff's HIV status to guards and inmates at the Holding Center. Once this information was revealed through the red sticker, disclosure by segregation would have been redundant. It is therefore nearly impossible for the court to assess whether segregation *alone* revealed plaintiff's HIV status.

Given these difficulties, I have reviewed the record very carefully. There was no direct testimony showing that anyone had deduced plaintiff's HIV status solely from observing her in segregation. With respect to fellow inmates who may have passed by Female Delta only occasionally, this leads me to conclude that there is insufficient evidence to find a violation of the Public Health Law. Guards, on the other hand, had the advantage of observing Female Delta on a regular basis. They were aware of which inmates were psychotic, and which were carrying blood-borne infectious diseases.[12] Over time, this additional information must have permitted guards to deduce which inmates were HIV+. Thus, by isolating plaintiff in Fe-

male Delta, defendants provided ECHC staff with "information which identifie[d] or reasonably could [have] identif[ied]" plaintiff as being infected with HIV. N.Y.Pub.Health Law § 2780(7). As it has already been determined that non-medical ECHC staff, except under limited circumstances which did not exist in plaintiff's case,[13] were not privy to this information, the court concludes that plaintiff's segregation in Female Delta during her 1989/90 confinement disclosed confidential HIV-related information about her to non-medical ECHC staff in violation of article 27–F of the Public Health Law and the CoC's regulations adopted pursuant thereto.

### B. *Constitutional Right to Privacy*

■ Having determined that plaintiff's segregation in Female Delta disclosed confidential HIV-related information about her to non-medical ECHC staff at the Holding Center in violation of article 27–F, the court must now examine whether this disclosure also violated plaintiff's constitutional rights. I held above that prison inmates are protected by a constitutional right to privacy from the unwarranted disclosure of their HIV status. *See supra* § I(B). Thus, it would appear that defendants' decision to segregate plaintiff impinged on her constitutional right to privacy. This does not end our inquiry, however, as we must determine whether ECHC's segregation policy is "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2261–62.

The elements of this test have already been spelled out. *See supra* § I(B). The first step is to decide whether there is a

---

**12.** Plaintiff gave extensive testimony describing the bizarre behavior of her fellow inmates. She also testified that guards trusted her to help them control these inmates, thus setting her apart from them.

**13.** On some limited occasions it would appear that revealing an inmate's HIV status by segregating them may be authorized by the regulations. Under the Holding Center's medical policy HCM 23.00.00, although housing decisions should not be made solely on the basis of an inmate's HIV status, such decisions can be made if the inmate is "at risk" in the general population, or if medical treatment indicates that

medical housing would be best. These determinations would follow for an inmate in an advanced stage of the disease, when he or she is susceptible to opportunistic viruses. Special housing can also be instituted when an inmate engages in high-risk behavior, such as needle-sharing or homosexual activity, to protect other inmates from infection. *See* Tr.Exh. 30J. Sections 7064.8(a)(15)(i) and (ii) also appear designed to permit disclosure under these circumstances. The difference between those circumstances and this case, however, is that no such findings were ever made for Louise Nolley.

valid, rational connection between the challenged policy and a legitimate governmental interest offered to justify it. Defendants have offered three justifications for their isolation of HIV+ inmates. The court has found factual support for only one of these reasons, *viz.*, protection of the general inmate population from accidental exposure to the virus. *See supra* (Findings of Fact § V). This reason is certainly legitimate. The question is whether a policy of segregating *all* HIV+ inmates in Female Delta is rationally related to this legitimate purpose.[14]

In *Harris v. Thigpen*, 941 F.2d at 1515–21, a case challenging the blanket HIV-testing and segregation policies of the Alabama prison system, the Eleventh Circuit engaged in an extensive analysis under *Turner*. Although the court noted that "[t]he logical connection between the stated goal[ ] of reducing HIV transmission ... and the DOC's policy of uniformly segregating seropositive prisoners, might be questioned," *id.* at 1516, it ultimately concluded that such an approach was not "irrational." *Id.* at 1517 (citing *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62).

The *Harris* court acknowledged that Alabama's decision to segregate all HIV+ inmates was now a minority position among correctional facilities nationwide. A recent preliminary draft of a National Institute of Justice report states that only four state systems—Alabama, California, Colorado, and Mississippi—currently segregate all known HIV-infected prisoners. *See* T. Hammett & A. Daugherty, *AIDS in Correctional Facilities: Issues and Options*, ch. 7 at 1, National Inst. of Justice (DRAFT 1990 Update, January, 1991). Of these states, both California and Colorado appear to be moving away from automatic segregation. *Id.* Moreover, the report states that "[o]nly two responding U.S. city/county jail systems segregate all known HIV-infected prisoners." *Id.* New York State Department of Correctional Services stopped isolating HIV+ inmates from the general population in 1987. This strong

trend away from automatic segregation of HIV+ inmates is echoed even within ECHC's own policies. HCM 23.00.00, adopted in December, 1989, states that "[h]ousing decisions, in the Erie County Holding Center, will *not be* made solely on the basis of the protected individual's HIV status." Tr.Exh. 30J at 3 (emphasis in original).

A strong trend toward integration of HIV+ inmates into the general population does not by itself, however, render a decision counter to that trend unconstitutional. Rather, ECHC's policy of segregating HIV+ inmates must be "so remotely connected to the legitimate goal[ ] of reducing HIV transmission ... within the [correctional facility] 'as to render the policy arbitrary or irrational.' " *Harris*, 941 F.2d at 1517 (quoting *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62). Although this is a very high threshold, the court believes that ECHC's segregation policy crossed this threshold. As I pointed out in my findings of fact, if ECHC's purpose behind segregating plaintiff was to reduce the possibility of transmitting HIV to non-HIV inmates, housing her in Female Delta with extraordinarily volatile non-HIV inmates was a strange choice. Louise Nolley graphically spoke of the chaotic and violent conditions in Female Delta. *See supra* (Findings of Fact § VI) (quoting Nolley, Aug. 21, 1990, at 59–60). One of the inmates housed with plaintiff repeatedly tried to cut herself. Another inmate approached plaintiff for homosexual relations. Given these dangerous conditions, the prospects for accidental transmission of the HIV virus to non-HIV inmates through blood-to-blood contact was increased, not decreased, by placing plaintiff in Female Delta.

More importantly, defendants' policy has done very little to protect the general inmate population from the risk of HIV transmission. Only *known* HIV carriers have been segregated. Nurse O'Malley admitted, however, that many *unknown* HIV

---

14. Plaintiff does not challenge that HIV+ inmates who engage in actions which place other inmates at risk of infection, such as needle sharing, or, in the case of male inmates, homosexual activity, should be isolated.

carriers are likely to be integrated into the general population at any given time. As ECHC's more recent policy attests, an inmate's HIV status alone does not make it likely that the inmate will transmit their HIV virus to another. *See* Tr.Exh. 30J at 3 (HCM 23.00.00). Rather, it is an HIV+ inmate's behavior toward non-HIV inmates which carries the risk of HIV transmission. Thus, ECHC's decision to segregate only on the basis of an inmate's HIV status, without regard to their behavior, while it may slightly reduce the possibility of accidental HIV transmission, does not seriously further that goal. Furthermore, it does not comport with ECHC's own policy, HCM 23.00.00, which calls for segregation only after a finding that an inmate is "behaviorally disruptive." *Id.* There was no such finding in plaintiff's case. Accordingly, the court finds that ECHC's policy of automatically segregating plaintiff in Female Delta based solely on her HIV status was not rationally related to the goal of reducing the risk of HIV transmission at the Holding Center.

The court also finds that ECHC's automatic segregation policy is an "exaggerated response" to its concerns. The policy alternative is found in ECHC's own regulation HCM 23.00.00, which the court has cited to repeatedly. "Housing decisions ... will *not be* made solely on the basis of the protected individual's HIV status." *Id.* Segregation of HIV+ inmates is permitted, however, after a finding that "the medical condition of the protected individual is 'at risk' in general population housing or if medical needs or treatment indicate" or "[i]f a protective individual is behaviorally disruptive and making threatening statements/gestures due to his [or her] HIV status...." *Id.* This policy could be instituted with minimal disruption. Thus, the fourth step of *Turner* is satisfied.

The second *Turner* factor also favors plaintiff, as there is no alternative means for inmates to exercise their right to privacy once it is lost. The third factor—the effect on guards, other inmates, and prison

resources—may favor defendants, but not enough to sustain the policy. It should not matter to guards whether HIV+ inmates are segregated, as under universal precautions they are trained to treat all inmates as if they might be HIV+. Nor can the court discern any significant impact on prison resources. The only potential impact is on other inmates who now may encounter a few more HIV+ inmates than they presently do. Given the fact defendants have admitted that HIV+ inmates already roam within the general inmate population, however, the court finds this incremental impact to be insignificant.

Accordingly, ECHC's policy of automatically segregating known HIV+ inmates in Female Delta is not reasonably related to legitimate penological interests.[15] Plaintiff's constitutional right to privacy was violated.

### C. *Due Process*

Plaintiff also complains that her segregation in Female Delta violated her constitutional right of due process under the Fourteenth Amendment.

The first question to answer in a due process claim is whether plaintiff has been deprived of a "life, liberty, or property" interest. The only interest at stake here was plaintiff's liberty. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983) (citing *Meachum v. Fano,* 427 U.S. 215, 223–227, 96 S.Ct. 2532, 2538–40, 49 L.Ed.2d 451 (1976)). I will address plaintiff's argument that the due process clause itself created a liberty interest first.

In *Hewitt v. Helms,* inmate Helms, who was suspected of participating in a violent prison riot, was removed from his cell and placed in administrative segregation while authorities investigated his role in the riot. *Id.* at 463, 103 S.Ct. at 867. Various re-

---

**15.** As the court has several times emphasized, *see supra* notes 13 and 14 and accompanying text, this holding does not implicate case-by-case decisions to segregate HIV+ inmates based on the findings contemplated in HCM 23.00.00.

ports and charges were filed during the time Helms remained in segregation. He was ultimately found guilty by a prison disciplinary committee of assaulting an officer and was sentenced to six months of disciplinary confinement. *Id.* at 465, 103 S.Ct. at 868. Helms sued, claiming that he was denied due process because he should have been granted a hearing prior to being confined in administrative segregation. The Court of Appeals agreed, but the Supreme Court reversed, holding that under the due process clause inmates have no general liberty interest in remaining in the general population of a prison. *Id.* at 467–68, 103 S.Ct. at 869. The Court reasoned:

> "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is otherwise not violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). See also *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980).
>
> It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. The phrase "administrative segregation," as used by the state authorities here, appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer.... Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.

*Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869. The critical inquiry in this analysis is whether " 'the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him [or her]....' " *Id.* (quoting *Montanye v. Haymes,* 427 U.S. at 242, 96 S.Ct. at 2547).

In *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254 (1980), the Court held that the transfer of a Nebraska state prisoner to a mental hospital was not within the range of confinement justified by a prison sentence. The Court cited two reasons. First, the transfer stigmatized the inmate as being mentally ill. Second, the inmate would be subjected involuntarily to institutional care in a mental hospital. These conditions were found by the Court to be qualitatively different from the punishment normally suffered by a person convicted of a crime. *Id.* at 493, 100 S.Ct. at 1264. Accordingly, the inmate was entitled to due process prior to his transfer.

Defendants argue, based on *Hewitt,* that plaintiff's liberty interests were not implicated by her segregation in Female Delta. Indeed, several courts, citing *Hewitt,* have rejected due process claims brought by inmates segregated because of their HIV status. *See, e.g., Muhammad v. Carlson,* 845 F.2d 175, 177 (8th Cir.1988), *cert. denied sub nom., Muhammad v. Quinlan,* 489 U.S. 1068, 109 S.Ct. 1346, 103 L.Ed.2d 814 (1989); *Powell v. Department of Corrections, State of Okla.,* 647 F.Supp. 968, 970 (N.D.Okla.1986); *Cordero v. Coughlin,* 607 F.Supp. at 10. Plaintiff counters that her detention in Female Delta, the "mental ward" at ECHC, was analogous to the involuntary transfer of the prisoner in *Vitek v. Jones* to the state mental hospital.

The court finds that the facts of this case are much closer to the conditions in *Vitek* than those in *Hewitt.* The inmate in *Hewitt* was confined in administrative segregation in the aftermath of a prison riot, during which time the prison authorities were legitimately concerned that further outbreaks could occur. Inmate Helms was suspected of participating in the riot and was therefore secluded until the authorities could determine exactly what had transpired. The authorities then conducted an investigation, brought charges against Helms and, on a finding of guilt, moved him from administrative to disciplinary segregation. In this case, there was no prison disturbance, nor even the threat of one. No reports were ever issued; no charges

were ever filed. Plaintiff was placed in administrative segregation from the moment she entered ECHC during each of her three confinements, and she remained there, with no administrative review, for the duration of those confinements.

In *Vitek*, an inmate was involuntarily transferred from prison to the state mental hospital. The stigma of being assigned to the mental hospital in *Vitek* was not dramatically different from the stigma associated with being involuntarily placed in Female Delta, a ward known to house inmates who were suicidal and psychologically unstable, or who were HIV+. Whether plaintiff was thought by outsiders to need psychiatric help, or to be HIV+, both of these classifications could have engendered serious adverse consequences for her. *See Vitek*, 445 U.S. at 492, 100 S.Ct. at 1263. Similarly, although Louise Nolley was not subject to mandatory behavioral modification as the inmate in *Vitek* was, she was subject to the kinds of pressures an inmate would face in a mental hospital. The inmates in Female Delta repeatedly tried to kill themselves, spoke often and in gruesome detail about the murders they had committed, ate out of the garbage, and so forth. *See supra.* Defendant Dray acknowledged that inmates should not be subjected to such conditions. This evidence indicates that confinement in Female Delta was qualitatively different from the punishment normally suffered by a person convicted of a crime. *See Vitek*, 445 U.S. at 493, 100 S.Ct. at 1264. For these reasons, I find that plaintiff was constitutionally entitled to due process. I do not rest on these points alone, however.

There is an additional factor that leads me to conclude that due process was violated here. In *Hewitt*, the Court concluded that an inmate's liberty was not constrained by administrative segregation because this was the "sort of confinement that inmates should reasonably anticipate receiving *at some point* in their incarceration." *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869 (emphasis added). The Court later added in a footnote, that:

Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates.

*Id.* at 477 n. 9, 103 S.Ct. at 874 n. 9. This language indicates that indefinite administrative confinement of an inmate without review by prison officials is outside "the terms of confinement ordinarily contemplated by a prison sentence." *Id.* at 468, 103 S.Ct. at 869. Louise Nolley was segregated in Female Delta under just those conditions. She was placed there upon admission during each of her three confinements and remained there throughout. Her segregation was never reviewed by defendants. Such confinement, based solely as it was on her HIV status, could not have been contemplated as part of a normal prison sentence. Accordingly, for the reasons cited above, the court finds that plaintiff's due process rights were violated.

 This conclusion is underscored by the second prong of *Hewitt*, in which the Court held that even if no liberty interest was created by the United States Constitution, an inmate could be protected by a state-created liberty interest. *Hewitt* held that procedural "guidelines" are insufficient to create such an interest; state or local regulations must be of an "unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" before a liberty interest may be created. *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. *See also Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 461–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989); *Muhammad v. Carlson*, 845 F.2d at 177. Plaintiff argues that the inmate handbooks for ECHC, Tr.Exhs. 20, 21, and ECHC policy and procedures created a protected liberty interest.

Two inmate handbooks were introduced into the record. One is dated May, 1987, Tr.Exh. 21; the other is dated March, 1989, Tr.Exh. 20. The first handbook contains a confusing discussion of administrative segregation, *see* 9 N.Y.C.R.R. § 7006.1(b)(1), but does not limit the discretion of prison officials to segregate inmates. *See* Tr.Exh. 21 at 20. The latter handbook, under the

heading "Administrative Segregation," states that

> The status of any inmate placed in Administrative Segregation *will* be reviewed every *seven days* to determine whether the reasons for initial placement in the unit still exist and a decision *will* be rendered at that time as to whether the inmate will remain in Administrative Segregation *or moved to general population.*

Tr.Exh. 20 at 28 (emphasis added and in original). This provision appears analogous to those found in Pennsylvania under which a state-created liberty interest was found in *Hewitt. See Hewitt,* 459 U.S. at 470 n. 6, 103 S.Ct. at 871 n. 6. Stronger language is found in ECHC medical policy and procedure HCM 23.00.00, effective as of December, 1989, which has been quoted in full above. *See supra* (Findings of Fact § V). It states that housing decisions "will *not be* made solely on the basis of the protected individual's HIV status. Special housing decisions can be made, however, ... *in the same manner as any inmate housed in general population." Id.* (emphasis in original). Neither the handbook nor HCM 23.00.00 prohibits defendants from segregating HIV+ inmates. Both, however, like the provisions in *Hewitt,* require particular administrative findings before initiating, and while continuing, such segregation.

Based on these ECHC regulations, I find that, as of their effective dates, the Holding Center created a liberty interest for plaintiff to be placed in the general inmate population absent a proper finding that she needed to be segregated. No such finding was ever made. There was never a medical determination made that she was "at risk" in the general population nor that her medical needs or treatment required segregation. No review of the decision to segregate her was ever undertaken. She was segregated upon entry during her 1988 confinement solely because she was HIV+. The decision to segregate her was automatically renewed for her 1989 and 1989/90 confinements. Accordingly, plaintiff's state-created liberty interests, and thus her constitutional due process rights, were violated during her 1989/90 confinement.

Finally, defendants argue that their actions are protected under the *Turner v. Safley* test discussed above. That analysis, however, does not apply here. This is not a situation where an otherwise valid regulation impinges on plaintiff's constitutional rights, but where the defendants failed to follow even their own regulations. Thus, *Turner* does not apply. Even if it did, for the reasons stated in § II(B), the court finds that plaintiff's segregation in Female Delta was not reasonably related to legitimate penological interests.

### D. *Equal Protection*

■ Plaintiff also challenges her segregation on equal protection grounds. Similar equal protection challenges to administrative segregation by HIV+ inmates have been universally rejected. *See, e.g., Judd v. Packard,* 669 F.Supp. 741, 743 (D.Md. 1987); *Powell v. Department of Corrections,* 647 F.Supp. at 971; *Cordero v. Coughlin,* 607 F.Supp. at 10; *Brickus v. Frame,* 1989 WL 83608, 1989 U.S. Dist. LEXIS 8510 (E.D.Pa. July 24, 1989). For plaintiff to invoke the equal protection clause, she must show that she was similarly situated with other inmates. *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). As an HIV+ inmate carrying a contagious disease, she has not made this showing. Accordingly, plaintiff's equal protection claims are denied. *Judd,* 669 F.Supp. at 743; *Cordero,* 607 F.Supp. at 10.

### III. CONDITIONS OF CONFINEMENT

■ Plaintiff argues that the conditions of her confinement were cruel and unusual punishment in violation of the Eighth Amendment. There is no question that the conditions in Female Delta were extremely stressful. Louise Nolley was housed with inmates who graphically described their horrible crimes, who were suicidal, who demonstrated severe psychiatric problems, and who were in a state of perpetual trauma. Plaintiff was asked on many occasions to assist ECHC staff in controlling

these inmates. Plaintiff also complains that at times she did not get the medicine she needed, especially AZT, a critical drug for combatting AIDS, or received it late.

Just this last term, the Supreme Court held that for conditions of confinement to violate the Eighth Amendment, prison officials creating those conditions must have possessed a culpable state of mind. *Wilson v. Seiter,* ── U.S. ──, 111 S.Ct. 2321, 2323–26, 115 L.Ed.2d 271 (1991). "[T]he offending conduct must be *wanton.*" *Id.* 111 S.Ct. at 2326 (emphasis in original). "[W]hether [the offending conduct] can be characterized as 'wanton' depends upon the constraints facing the *official.*" *Id.* (emphasis in original). Drawing on the holding of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment, *id.* at 104, 97 S.Ct. at 291, the Court found "no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'" *Wilson,* 111 S.Ct. at 2326. Therefore,

> "Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle.*"

*Id.* at 2327 (quoting *LaFaut v. Smith,* 834 F.2d 389, 391–92 (4th Cir.1987)).

Aside from announcing a subjective component for Eighth Amendment jurisprudence, *Wilson* reaffirmed the longstanding objective requirement. "The Constitution, we said, 'does not mandate comfortable prisons,' [*Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981),] and only those deprivations denying 'the minimal civilized measure of life's necessities,' *id.,* at 347, 101 S.Ct. at 2399, are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson,* 111 S.Ct. at 2324. *See also Deutsch v. Federal Bureau of Prisons,* 737 F.Supp. 261, 266 (S.D.N.Y.1990), *aff'd without opinion,* 930 F.2d 909 (2d Cir.

1991); *Cordero v. Coughlin,* 607 F.Supp. at 11. Applying this objective standard to the stressful environment in Female Delta, the court finds that the overall conditions in the pod, although severe, were not sufficiently traumatic to violate the Eighth Amendment. *See Griffin v. Coughlin,* 743 F.Supp. 1006, 1018 (N.D.N.Y.1990) (finding noise level and stress of environment insufficient for Eighth Amendment violation); *Cordero,* 607 F.Supp. at 11. Plaintiff does not complain that the stress of being incarcerated in Female Delta caused her any physical harm. Nor is there any evidence that ECHC failed to clothe her, or feed her, or provide her with sufficient warmth. Moreover, plaintiff was able to escape some of the stress of her environment by entering her cell and closing the door.

The several instances where plaintiff's AZT was either not delivered or was delivered late, did, however, deprive plaintiff of a necessity of life under the Eighth Amendment. *See Roe v. Fauver,* No. 88–1225, slip. op. at 9, 1988 WL 106316 (D.N.J. Oct. 7, 1988). AZT is an absolutely vital medication for HIV+ persons because it is the only medication known to slow the advance of the disease. *Id.* With the objective component of an Eighth Amendment violation thus proven, the question is whether defendants' late delivery or nondelivery of AZT amounted to "deliberate indifference." The court finds that it did not. The most that plaintiff has proven is that the Holding Center was negligent in its delivery of medications. Although this was deplorable conduct in the care of an HIV+ inmate, there is not enough evidence that defendants possessed the culpable state of mind necessary to be found guilty of an Eighth Amendment violation. *See Wilson,* 111 S.Ct. at 2328. Accordingly, plaintiff's Eighth Amendment claims must be denied.

## IV. *LAW LIBRARY and RELIGIOUS SERVICES*

Plaintiff alleges that defendants' decision to deny her access to ECHC's law library and to communal religious services violated

her constitutional rights. I will take up each argument in turn.

■ During each of her three confinements, plaintiff was denied direct access to the ECHC law library. The only time she was even allowed in the library was on four occasions during her 1989/90 confinement, but this was only to use the typewriter. Plaintiff was not permitted to touch the law library's books. To receive materials from the library, she was required to submit written requests for specific cases to staff librarians who, in turn, would copy those cases for her. The process was tedious, time-consuming, and not productive. The court has been informed that ECHC no longer denies HIV+ inmates direct access to the law library.

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977).

We hold, therefore, that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.

*Id.* at 828, 97 S.Ct. at 1498. *See also Griffin v. Coughlin*, 743 F.Supp. at 1019–25 (discussing elements of constitutional violation in great detail); *Harris v. Thigpen*, 941 F.2d at 1527.

This constitutional right was denied. Plaintiff was never permitted direct access to any of the volumes in the law library. Plaintiff was also denied face-to-face contact with inmate law clerks. *See Griffin*, 743 F.Supp. at 1022–24. The system whereby plaintiff was required to request copies of specific materials without being able to conduct general research or work with inmates who could help with that research was woefully inadequate. Thus, plaintiff was not given adequate access to a law library nor adequate assistance from a person trained in the law. By now choosing to alter these practices, defendants have essentially admitted that the prior practice was misguided. Current ECHC policy is that no inmate will be denied access to programs based solely on their HIV status. *See* Tr.Exh. 30J at 3 (HCM 23.00.-00).

The denial of access to the law library is also not justified under the *Turner v. Safley* test. As I discussed in my findings of fact, plaintiff was denied access to the law library as a result of an *ad hoc* policy implemented by defendant Dray. ECHC policies and procedures were not followed. Thus, there can be no argument that she was denied access pursuant to a regulation reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 89, 107 S.Ct. at 2261–62. Moreover, defendant Dray apparently believed in the face of overwhelming evidence to the contrary, *see supra* note 1 and accompanying text (quoting Dray's testimony), that plaintiff could transmit the HIV virus to others by using the law books in the library or by using the typewriter found there. He required plaintiff to wear plastic gloves on the four occasions she was permitted to use the library typewriter. The evidence at trial established that plaintiff could not infect other inmates in this way. Therefore, there was no rational connection between the legitimate goal of limiting the possibility of HIV transmission and denying plaintiff access to the library. Accordingly, plaintiff's constitutional right of access to the courts was denied.

Plaintiff also claims that defendants abridged her First Amendment right to free exercise of religion by denying her access to congregate religious services.

■ The right to attend congregate religious services is not absolute. The Supreme Court has held that where denial of access to such services is reasonably related to legitimate penological objectives, it is valid. *O'Lone v. Estate of Shabazz*, 482 U.S. at 353, 107 S.Ct. at 2407. *See also Matiyn v. Henderson*, 841 F.2d 31, 37 (2d Cir.), *cert. denied*, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988); *Griffin v. Coughlin*, 743 F.Supp. at 1025 & n. 17; *Aliym v. Miles*, 679 F.Supp. 1, 2 (W.D.N.Y.1988) (Curtin, J.). These cases

have upheld denial of access to communal services based in part on the serious security concerns of the prison. *O'Lone,* 482 U.S. at 351, 107 S.Ct. at 2405–06; *Griffin,* 743 F.Supp. at 1025 n. 17; *Aliym,* 679 F.Supp. at 2. Those are not the reasons advanced here, however.

As with the denial of access to the law library, plaintiff was not permitted to attend Catholic services as a result of an *ad hoc* policy implemented by defendant Dray. Current ECHC policy and procedure, which was also in effect during plaintiff's 1989/90 confinement, would have permitted plaintiff to attend communal services. Dray did not follow this policy, apparently because he feared that plaintiff might infect other inmates with HIV during church services. As Dray admitted at trial, however, he substituted his own layman's understanding of how the HIV virus can be transmitted for expert medical opinions on the subject. *See supra* note 1. Mr. Dray's opinions in this regard were completely contradicted by Dr. Hewitt, who testified on the limited way in which the HIV virus can be passed. Accordingly, although preventing the spread of HIV infection is certainly a legitimate penological objective, there was no evidence introduced by defendants which would show that the decision to deny plaintiff access to church services was reasonably related to that purpose. *See Walker,* 917 F.2d at 386. This conclusion is reinforced by the fact that ECHC now permits HIV inmates (and Louise Nolley during the last segment of her 1989/90 confinement) to attend communal services. The court finds that plaintiff's First Amendment rights were abridged.[16] Her denial of rights was mitigated significantly, however, by the fact that throughout her three confinements, plaintiff was permitted one-on-one meetings in Female Delta with a Catholic priest. *Cf. Griffin,* 743 F.Supp. at 1026–27.

## V. REHABILITATION ACT

 Plaintiff's last claim is that defendants denied her access to programs at the Holding Center in violation of the Rehabilitation Act, 29 U.S.C. § 794. Section 794 states:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving *Federal financial assistance. . . .*

29 U.S.C. § 794(a) (emphasis added). The statute goes on to define "program or activity" as "all of the operations of—(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b). Defendants have admitted that in each of the three years plaintiff was confined, Erie County received approximately $779,060.00 in federal funds for the detention of federal prisoners at the ECHC. Defendants argue, however, that the Act does not apply to them because the federal funds received by Erie County were a payment, at fair market value, for detention services at the ECHC, and thus did not constitute "Federal financial assistance" under the Act. 29 U.S.C. § 794.

The phrase "Federal financial assistance" is not defined in the Rehabilitation Act. Nevertheless, several courts have held that "an entity receives financial assistance when it receives a subsidy." *De-Vargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1382 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). *See also Hingson v. Pacific Southwest Airlines,* 743 F.2d 1408, 1414 (9th Cir.1984); *Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1208–09 (9th Cir.1984), *cert. dismissed,* 471 U.S. 1062, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985); *Bachman v. American Soc'y of Clinical*

---

**16.** The court does not find, however, that ECHC must always permit HIV+ inmates to access congregate services. An individual's medical condition or the security of the facility may require denial of access in particular cases. *See* Tr.Exh. 30J at 3 (HCM 23.00.00). These findings were not made in plaintiff's case.

*Pathologists,* 577 F.Supp. 1257, 1264 (D.N.J.1983); *Cook v. Budget Rent–A–Car Corp.,* 502 F.Supp. 494, 496 (S.D.N.Y.1980). *Cf.* 34 C.F.R. § 104.3(h) (1990) (Department of Education regulations defining "Federal financial assistance"). Payment of fair market value for services rendered does not constitute a subsidy. *Jacobson,* 742 F.2d at 1210;[17] *Cook,* 502 F.Supp. at 498. There is no evidence that the federal funds received by Erie County in 1988, 1989, and 1990 to detain federal prisoners in the ECHC exceeded the fair market value for this service. Thus, ECHC did not receive "Federal financial assistance" during the years plaintiff was confined. Accordingly, plaintiff's claim under the Rehabilitation Act is denied.

## VI. RELIEF

With this long opinion, the court has drawn the following conclusions, here reiterated in abbreviated form:

I. *Red Sticker Policy*

A. Defendants' red sticker policy violated plaintiff's privacy rights under article 27–F of New York's Public Health Law and CoC regulations.

B. Defendants' red sticker policy also violated plaintiff's constitutional right to privacy. The policy was not reasonably related to legitimate penological interests.

II. *Segregation*

A. Defendants' policy under which plaintiff was automatically segregated in Female Delta violated plaintiff's privacy rights under article 27–F of the Public Health Law and CoC regulations.

B. This policy decision also violated plaintiff's constitutional right to privacy. The policy was not reasonably related to legitimate penological interests.

C. This policy also violated plaintiff's rights under the due process clause.

D. Defendants' segregation policy did not violate plaintiff's equal protection rights.

III. *Conditions of Confinement*

The conditions of confinement which plaintiff was subjected to in Female Delta, although deplorable, did not violate plaintiff's Eighth Amendment rights.

IV. *Law Library and Religious Services*

Plaintiff was deprived of her constitutional right of access to courts. This deprivation was based on an *ad hoc* policy implemented by Superintendent Dray and was not reasonably related to legitimate penological interests.

Plaintiff was also deprived of her First Amendment right to access congregate religious services. This deprivation was also based on an *ad hoc* policy implemented by Superintendent Dray and was not reasonably related to legitimate penological interests.

V. *Rehabilitation Act*

There was no violation of the Rehabilitation Act because ECHC did not receive "Federal financial assistance" under the Act.

These conclusions, by themselves, do not answer the difficult question of what relief should be afforded plaintiff as a result of the statutory and constitutional violations found above. Plaintiff seeks both injunctive and monetary relief. With respect to injunctive relief, the court has significant doubts whether *Ms. Nolley* still has standing to seek this relief, given the fact that she is no longer incarcerated in the Holding Center and has no prospects of returning there. *See, e.g., Los Angeles v. Lyons,* 461 U.S. 95, 105–07, 103 S.Ct. 1660, 1667–68, 75 L.Ed.2d 675 (1983). This relief may, however, be appropriate for other HIV+ inmates currently housed at ECHC. The court will defer ruling on this request until such time as it can meet with the parties.

17. The *Jacobson* court, as well the Tenth Circuit in *DeVargas,* 911 F.2d at 1382, hold that the test for whether federal funds amount to financial assistance does not turn on an accounting of "fair market value," but on the *intention* of the government to grant or not to grant a subsidy. My conclusion below does not depend on this distinction, for I find that under either the "fair market value" or the "intention" test, there was no evidence of a subsidy here.

**744**

With respect to monetary relief, the court also chooses at this time not to render a final judgment as to the liability of the four remaining defendants. Questions remain, for example, as to whether any of the defendants are entitled to qualified immunity, and the appropriate measure for damages, should any be awarded. The court may require additional briefing on these issues, but will again defer making a decision until a meeting with the parties can be held. There may also be other issues the parties will want to bring to the court's attention.

So ordered.