**Nathaniel JONES–BEY, Plaintiff,**

v.

**Charles WRIGHT, Charles Stang, Charles Motley, M.D., Laurie Ebling, Andre Lawson, James Kimmel, Dawn MacMillan, Michael T. Scott, Paula Gott, Purnell Sparks, W. Dobson, and D. Davis, Defendants.**

No. 3:95–CV–0789AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 30, 1996.

Nathaniel Jones–Bey, Westville, IN, Pro Se.

Suzann W. Lupton, Office of Indiana Attorney General, Indianapolis, IN, for Defendants.

### *MEMORANDUM AND ORDER*

ALLEN SHARP, Chief Judge.

Nathaniel Jones–Bey ("Jones–Bey") filed this *pro se* action pursuant to 42 U.S.C. § 1983, and invoking this court's federal question subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Jones–Bey's complaint alleges that former Maximum Control Complex ("MCC") Superintendent Charles Wright and several other MCC officials violated his federally protected rights by placing him on medical separation status after he refused to take a tuberculosis ("TB") screening test. The motion for summary judgment filed by the defendants pursuant to Fed.R.Civ.P. 56 demonstrates the necessary compliance with *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir.1982), and the plaintiff filed an elaborate response to the defendants' summary judgment motion.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993). The party seeking summary judgment must demonstrate that there is no genuine issue of fact, and that the movant is entitled to judgment as a matter of law. *Id.; Duane v. Lane,* 959 F.2d 673, 675 (7th Cir.1992). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Sims v. Mulcahy,* 902 F.2d 524, 540 (7th Cir.), *cert. denied,* 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). If the non-movant fails to do so, summary judgment is proper. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Harbor House Condominium Ass'n v. Massachusetts Bay Ins. Co.,* 915 F.2d 316, 320 (7th Cir.1990). The court must construe the facts as favorably to the non-moving party as the record will permit, *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991), and draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Prince v. Zazove,* 959 F.2d 1395, 1398 (7th Cir.1992), as long as the inferences are reasonable. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

Jones–Bey alleges that on or about September 10, 1993,[1] an MCC nurse asked him to take a Mantoux tuberculosis test by injection. Jones–Bey characterizes this test as "the injection of Poison T.B. Germ," which he states that he refused based on his Islamic religious beliefs. In response, Supt. Wright ordered Jones–Bey to be moved to a portion of the MCC which had been set up as a medical separation or tuberculosis quarantine area. Jones–Bey remained on medical separation status until October 18, 1996.[2] Jones–Bey further alleges that while he was medically separated, he was denied out-of-cell recreation and could not visit the law library, have telephone calls or visits, or have daily showers. He also asserts that he pled guilty to a conduct report for failing to obey the order to take the test, and that he was required to serve the sanction twice; once while he was medically segregated, and again after the end of his medical isolation status. Based on these events, Jones–Bey asserts eleven counts alleging violation of rights protected by the First, Fourth, Eighth, and Eleventh Amendments; in the body of his complaint he also alleges the excessive use of force when he was finally tested, and that he was denied access to the courts. This court recently evaluated some similar claims in *Jihad v. Wright,* 929 F.Supp. 325 (N.D.Ind. 1996), a case which arose from a 1995 incident at the MCC where an inmate was placed in medical isolation after he refused to submit to a TB test for religious reasons.

1. Jones–Bey's complaint actually states that this incident occurred "on or about September 10, 1995," but subsequent dates in his complaint and the other materials submitted by the parties establish that the incident of which he complains occurred in 1993.

2. The defendants assert that Jones–Bey was taken off medical separation status as of October 18, 1993, after he tested negative for TB. In his affidavit opposing summary judgment, Jones–Bey asserts that he "contests and shows that this is not true." He states that shower, recreation, and phone privileges were returned after he completed serving the disciplinary sanction which commenced on that date, "however, Plaintiff was still kept on the isolation unit."

The parties' contentions in this regard do not establish a contested issue of material fact because so long as the medical isolation unit was disbanded on October 18, and the restrictions placed on inmates because of their medical isolation status were lifted, it does not matter whether Jones–Bey remained in the same cell he had been in while he was medically isolated. Accordingly, this court concludes, for the purposes of this memorandum, that Jones–Bey's medical isolation status ended on October 18, 1993.

In support of their summary judgment motion, the defendants submit the declarations of former MCC Superintendent Charles Wright, former Custody Supervisor James Kimmel, Administrative Assistant Mike Scott, and Nurse Karen Heinrich. They also submit copies of Jones–Bey's daily activity records between September 5 and October 23, 1993, and a copy of the videotape of the TB test administered to Jones–Bey on October 15, 1993.[3] According to the defendants, in the fall of 1993, the Indiana Department of Correction ("IDOC") decided to test all inmates and employees for tuberculosis because of a TB outbreak at another facility. Jones–Bey refused to take the injection test, Correctional Sergeant Charles Stang ordered him to submit to the test, Jones–Bey refused, and Sgt. Stang wrote him up for a conduct violation. Jones–Bey, and several other inmates who refused to take the test, were placed on the medical separation unit which consisted of a group of cells or a "pod." The unit was ventilated by air which was brought in from outside the prison.

According to the defendants' submissions, inmates on the medical separation unit received showers approximately three times a week and an average of one-half hour of out-of-cell recreation per day. The defendants submit documentation establishing that Jones–Bey received out-of-cell recreation on a fairly regular basis until September 26, 1993. But these records do not reflect that Jones–Bey received recreation between September 27 and October 19, 1993, which coincides with the period during which he was medically isolated. The inmates were denied the use of telephones for personal calls but had access to the phone to contact their attorneys. Inmates were provided with legal materials as requested.

The IDOC, working with the State Board of Health, obtained an order from the LaPorte Superior Court to allow MCC officials to conduct involuntary testing of the hold-out inmates, including Jones–Bey. These tests were conducted by a team of correctional officers who escorted Jones–Bey and the other inmates to the recreation area one at a time. Capt. Kimmel read the court order to Jones–Bey and asked if he would comply with the order willingly. The defendants state that Jones–Bey did not agree to voluntarily submit to the test, so he was held down by officers while a nurse administered the shot. Jones–Bey was released from medical separation on October 18, 1993, when the test established that he was TB negative. The defendants assert that no inmate at MCC had active tuberculosis and that none of the inmates on the medical separation unit tested positive for TB.

The MCC is a closed environment where a contagious airborne communicable disease like TB can spread rapidly. According to the defendants, the medical separation policy was designed to protect other inmates and staff, and the skin test is the least invasive method of determining if a person carries the TB antibody. A chest x-ray cannot be used in place of a skin test to make this determination, though x-rays are useful in determining if a person has an active case of TB. *Jihad v. Wright,* 929 F.Supp. at 328.

Jones–Bey submits his own affidavit and supporting materials which contest several of the defendants' assertions. According to Jones–Bey's affidavit, in September, 1993,[4]

3. In their memorandum, the defendants state that Jones–Bey was tested on October 10, 1993, Karen Heinrich's declaration states that he was tested on October 13, and the declarations of Michael Scott, and James Kimmel, who directly supervised the test, state that he was tested on October 15. It is not unusual to see conflicting affidavits submitted by opposing parties, but it is a little out of the ordinary to see conflicting affidavits submitted by defendants represented by the same counsel, who then uses a date in her memorandum that is different than any date stated in her clients' affidavits.

The Laporte Superior Court's order compelling the medical examination is dated October 15,

1993, the videotape of the testing is dated October 15, and Jones–Bey does not allege that he was tested before the court order was issued. Accordingly, this court concludes, for the purposes of this memorandum, that Jones–Bey was tested on October 15, 1993.

4. As with the date the TB test was conducted, the parties' submissions create some doubt as to the date Jones–Bey was segregated. Jones–Bey never gives a precise date for his segregation. In his complaint he states that he refused the TB injection "on or about September 10, 1995;" In his affidavit, he states that on an unspecified date "in September, 1993," he refused the TB test,

Nurse Ebling asked him to submit to a PPD test and, upon his refusal, ordered him to take the test. He responded "that she could not give me no orders; she was not custody." Correctional Sergeant Stang "then proceeded to give me an order to take Mantoux, PPD, TB test; I stated No, that he could not tell me anything about medical; that he was custody."

Sgt. Stang wrote a conduct report on Mr. Jones–Bey for refusing to obey his order. In his affidavit, Jones–Bey states that he pleaded guilty to the conduct report and was sanctioned with the loss of recreation and use of telephones for fourteen days beginning from the date of the hearing, which the report of hearing establishes as September 29, 1993. The report of disciplinary hearing states that Jones–Bey was sanctioned for "4 days ½ recreation + 14 day No phone." Jones–Bey asserts that he served the restrictions while on the medical unit, and then was required to serve the restrictions again when his medical isolation status ended. According to Jones–Bey, he was confined to his cell twenty-four hours a day for the entire period he was in medical isolation, and the quarantine unit was not properly ventilated. Jones–Bey states that the medical isolation unit was in one section of C Pod, but general population inmates were housed in the three other sections of C Pod and shared the same ventilation system. He further states that he was told that other MCC inmates tested positive during this round of tests.

Jones–Bey states that when he was taken from his cell to be tested, he was dressed only in a T Shirt. He asserts that he "insisted" that he be given the injection at the cell door; but Capt. Kimmel responded that "you had your chance," and the officers took him to the recreation pod where he was read the court order. Jones–Bey states that he "agreed to allow Defendants to inject poison PPD Mantoux TB germs into Plaintiff based on the court's order." Despite his acquiescence, he alleges that the officers "forcefully and violently slammed him" to the floor "causing pain that was not necessary ..." He further alleges that while he was on the floor, Captain Kimmel "took Plaintiff's head and began to slam Plaintiff's face into the floor causing busted lip," that officers "fondled (his) buttocks and groin," and that they exposed his private parts to the female nurses.

Jones–Bey argues that it is not necessary to isolate prisoners who refuse to be tested, or even all inmates who test positive for TB, because TB is not infectious unless the person is symptomatic. Persons who test positive for TB may be asymptomatic and non-infectious. Only a small percentage of infected persons develop active TB, and when they become symptomatic they become contagious. Jones–Bey argues that there are several ways to test for active contagious cases of tuberculosis, including x-rays, spatum tests, and the PPD. He states that he had

was written up for disobeying an order and transferred to medical isolation. The defendants' memorandum states that Jones–Bey refused the order to take the TB test on September 10, 1993, and defendant Scott's declaration states that Jones–Bey "refused a request and an order to submit to testing on September 10, 1993. He was therefore moved to a medical separation unit," and he remained on the medical separation unit "from September 10, 1993 to October 18, 1993."

The documentation submitted by the parties, however, does not support September 10 as the date when Jones–Bey refused an order or the date he was placed in medical isolation. Jones–Bey submits the conduct report written by Sgt. Stang for refusal to obey an order. This conduct report was written on September 27, 1993, and states that the date of the incident was September 27, 1993. The defendants submit documentation of Jones–Bey's daily activities, including showers and recreation. These documents show Jones–Bey's cell location on the week beginning on September 5, 1993 as cell B–3–101 on B Pod. The activity reports for the weeks beginning on September 12, September 19, and September 26, 1993, also show Jones–Bey's cell location as B–3–101. These activity sheets are followed by offender segregation records showing Jones–Bey as being on segregation status on the weeks beginning on October 3 and October 10, 1993, followed by an activity sheet for the week of October 17–23, 1993, showing Jones–Bey as cell location C–8–206 on C Pod. The medical separation unit was on C pod.

The parties agree that Jones–Bey was not segregated until after he refused Sgt. Stang's order to take the test, and the conduct report written by Sgt. Stang establishes that he gave that order to Jones–Bey on September 27, 1993. Based on the documentary evidence, the court concludes, for the purposes of this memorandum, that Jones–Bey was first segregated on September 27, 1993.

been tested several times by x-ray for tuberculosis at the MCC prior to this incident.

## I.

■ Jones–Bey seeks injunctive relief and damages, but he does not allege that he is currently under any threat of TB testing by injection or from being placed in medical separation. Jones–Bey's release from the medical separation unit and his return to general population moots his claims for injunctive relief, *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Forbes v. Trigg,* 976 F.2d 308, 312 (7th Cir.1992), *cert. denied,* 507 U.S. 950, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993), and his declaratory relief claims. *See, e.g., Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (applying the capable-of-repetition doctrine without discriminating between claims for declaratory relief and claims for injunctive relief.) Accordingly, the court GRANTS summary judgment to the defendants on Jones–Bey's claims for injunctive and declaratory relief.

## II.

Jones–Bey's complaint alleges that he was denied access to the institutional law library while he was medically separated. In his memorandum opposing summary judgment, he asserts that the defendants violated his Sixth Amendment right to access to the courts; states that he "was working on not less than (15) fifteen legal endeavors in the courts," and claims that the lack of law library access "caused Plaintiff not to be able to even present some actions into court and having others dismissed from not being able to adequately respond." Jones–Bey's memorandum states no specific case which was dismissed or any specific claim which he was unable to file, and his affidavit is silent on this subject. Elsewhere in his memorandum, he asserts that "(w)here core requirements are at stake, Plaintiff need not prove an 'actual injury' from being deprived access in order to prove a Constitutional violation."

■ It has long been established in this circuit that to establish a violation of the right to access to the courts, an inmate must meet both prongs of a two prong test. *Jen-*

*kins v. Lane,* 977 F.2d 266, 268–269 (7th Cir.1992). Under the first prong, the inmate must show that prison officials failed to provide the assistance required by *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); to meet the second prong, the prisoner must show some "quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation." *Jenkins v. Lane,* 977 F.2d at 269, *citing Shango v. Jurich,* 965 F.2d 289, 293 (7th Cir.1992). The Supreme Court recently approved this approach in *Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996), where it held that *Bounds v. Smith* did not eliminate the actual-injury requirement as a constitutional prerequisite to a prisoner asserting lack of access to the courts.

■ Prior to *Lewis v. Casey,* the showing of detriment was waived if the prisoner alleged a direct, substantial, and continuous, rather than a "minor and indirect" limit on legal materials. *DeMallory v. Cullen,* 855 F.2d 442, 448–49 (7th Cir.1988); *Jenkins v. Lane,* 977 F.2d at 268. But in *Lewis,* the Supreme Court held that the actual-injury requirement should not be waived even "in cases 'involving substantial systematic deprivation of access to court,'" including the "total denial of access to a library," or "an *absolute* deprivation of access to all legal materials" *Lewis v. Casey,* —— U.S. at —— n. 4, 116 S.Ct. at 2181 n. 4 (emphasis in original).

■ Standing alone, delay and inconvenience do not rise to the level of a constitutional deficiency. *Campbell v. Miller,* 787 F.2d 217, 229 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986), and Jones–Bey's submissions do not adequately establish that his sojourn in medical isolation caused any actual detriment to his "legal endeavors." Because Jones–Bey has not specified any actual injury to a specific case or legal claim, and has not supported his general claim of injury by affidavit, the court GRANTS the defendants' motion for summary judgment on Jones–Bey's Sixth Amendment claims.

## III.

In his eighth, ninth, tenth and eleventh causes of action, Jones–Bey asserts that the defendants imposed cruel and unusual punishments on him in violation of the Eighth Amendment. Jones–Bey's allegation that the defendants punished him, without penological purpose, for following his religious beliefs, will be dealt with by the court in its consideration of his First Amendment claims. His remaining Eighth Amendment claims are essentially that the conditions he was subjected to on the medical separation unit were constitutionally infirm, that he was placed on a unit with persons who had tested positive for TB thereby increasing his chances of contracting TB, and that officers used excessive force in performing the court ordered TB test and unnecessarily exposed his private parts to female nurses.

■■■ The Eighth Amendment prohibits punishment that is "cruel and unusual." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). A violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter,* 501 U.S. at 299, 111 S.Ct. at 2324–2325. In *Farmer,* the Supreme Court defined "deliberate indifference" as "criminal recklessness." To act recklessly, a person must "consciously disregard" a substantial risk of serious harm. *Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1980. To meet the subjective prong of the *Wilson* test, "deliberate indifference" exists "when a prison official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Jolly v. Coughlin,* 76

F.3d 468, 481 (2d Cir.1996), *citing Farmer v. Brennan,* 511 U.S. at ——, 114 S.Ct. at 1984.

The parties submitted conflicting affidavits regarding the conditions Jones–Bey was subjected to in medical isolation. Defendants Wright and Scott state that inmates on the medical separation unit received half an hour out-of-cell recreation daily and showers three times a week,[5] and that no inmates at MCC tested positive for TB. In contrast, Jones–Bey asserts that he received no recreation or showers while he was medically separated, and that he was told that four inmates tested positive for TB.

This court held in *Jihad v. Wright,* that the conditions on the medical isolation unit established in 1995, which were virtually identical to those alleged by Jones–Bey, would not violate the objective prong of the *Wilson* test over a short period of time, but at least the lack of out-of-cell time could violate the Eighth Amendment if imposed for the six months alleged by Jihad. *Jihad v. Wright,* 929 F.Supp. at 332, *citing Davenport v. DeRobertis,* 844 F.2d 1310, 1314 (7th Cir.), *cert. denied, by Lane v. Davenport,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). The defendants' own records indicate that Jones–Bey was without out-of-cell recreation from September 27 through October 19, 1993.

■■ Giving Jones–Bey the benefit of the doubt by assuming that Jones–Bey was segregated on September 10, instead of September 27, 1993, he would have spent a maximum of 40 days without out-of-cell recreation, as opposed to the six months alleged in *Jihad v. Wright,* and the three months discussed in *Davenport v. DeRobertis.* The court concludes that, even giving him the benefit of every doubt, imposition of the conditions alleged by Jones–Bey for less than six weeks did not violate the standards of *Farmer v. Brennan,* and *Wilson v. Seiter.*

---

5. The records submitted by the defendants, however, contradict their affidavits at least as far as Jones–Bey is concerned. The records indicate that Jones–Bey received recreation on September 26, 1993 and again on October 20, 1993, but not between those dates. The records indicate that,

at most, he only received four showers during the same period. For the purposes of this memorandum, the court concludes that Jones–Bey had no out-of-cell recreation for at least this twenty-three day period.

Jones–Bey also contends that his placement in the medical separation unit violated the Eighth Amendment because it increased his chances of catching TB. But he also states in his affidavit, that an inmate who had tested positive for TB on a previous occasion "was placed in general population, and was in fact placed in (the) cell next to the cell where I was located." So, even assuming all his allegations to be true, his submissions do not establish that placement in the medical isolation unit significantly increased his chances of contracting TB. Moreover, while Jones–Bey asserts considerable mental anguish, he does not allege that he contracted TB as a result of this incident which occurred over three years ago. Recent amendments to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e(e), provide that a prisoner may not bring a federal action "for mental or emotional injury suffered while in custody without a prior showing of physical injury."

In regard to the officers' conduct during the court ordered test, the use of physical force by correctional officers against an inmate may state a claim under § 1983, but "(n)ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian,* 503 U.S. 1, 10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992), *quoting Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). The Eighth Amendment excludes from constitutional recognition *de minimis* use of force, so long as it is not of a type which is "repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1 at 10–11, 112 S.Ct. 995 at 1000, *citing Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). Officers may use reasonable amounts of force in a good faith effort to maintain or restore discipline or order. *Hudson v. McMillian,* 503 U.S. at 6–7, 112 S.Ct. at 999.

The defendants submitted a videotape of Jones–Bey's TB test, which has been carefully reviewed. Capt. Kimmel, the officer in charge, briefed the team members on what their duties would be. Capt. Kimmel stressed the importance of immobilizing the inmates, especially their left arms, because if an inmate struggled, the needle might break off in his arm. The inmates were held face down on a gymnastics mat to immobilize them during the injection process.

Much of what Jones–Bey said during this episode is inaudible, but he clearly stated "I'm not taking this shit by choice," and "I'm not laying down" to take the test. Because most of what Jones–Bey said during this incident is inaudible, the court is unable to determine whether or not Jones–Bey said he would consent to be tested when confronted with the court order, but the tape confirms that he refused to lay down to take the test. The court concludes that requiring an inmate who has refused to take a test by injection, except under court order, to lay down and have his arm immobilized during the test does not violate his federally protected rights, *Caldwell v. Miller,* 790 F.2d 589, 596 (7th Cir.1986) (requiring courts to accord "wide-ranging deference" to prison officials "in adopting policies that are needed to preserve internal order and security."), and that reasonable force used to immobilize an inmate during such a test is *de minimis* within the meaning of *Hudson v. McMillian,* and does not violate the Eighth Amendment.

The tape establishes that Jones–Bey was removed from his cell at 1:52 and returned to his cell at 1:54, and the entire incident took between three and four minutes. Jones–Bey refused to cooperate by laying down, but he did not physically resist when the officers picked him up and placed him face down on the mat. Jones–Bey's affidavit contains statements about excessive use of force which would normally preclude summary judgment, but the videotape establishes that the officers acted with professionalism and restraint throughout this episode, did not use excessive force, and did not reveal Jones–Bey's private parts to the nurse who administered the shot. The tape does not confirm any of Jones–Bey's allegations, and the court concludes that based on this evidence, no reasonable finder of fact could find that the officers' conduct violated Jones–Bey's Eighth

Amendment rights under the standards set forth in *Hudson v. McMillian*.

For the reasons stated in this portion of the memorandum, the court **GRANTS** the defendants' motion for summary judgment on each of Jones–Bey's Eighth Amendment claims.

### IV.

In count 5 of his complaint, Jones–Bey alleges that the defendants violated his Fourteenth Amendment rights by placing him in the tuberculosis quarantine unit without due process; in count 6, he asserts that they violated his due process rights when they disciplined him for refusing to take the TB test for religious reasons, and then imposed double jeopardy on him in serving the sanction imposed; and in count 7 of his complaint he asserts that they infringed upon a "liberty interest" when they placed him in restrictive medical isolation for adhering to his religious beliefs.

 Jones–Bey asserts that he received a disciplinary sanction because he refused an order based on his religious beliefs. Review of the parties' submissions establish that the sanctions imposed as a result of this disciplinary action are not the sort of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that trigger the Due Process Clause in prison disciplinary actions, *Sandin v. Conner*, — U.S. —, —, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Moreover, even if these sanctions constituted an atypical and significant hardship, the parties' submissions do not indicate that he was denied due process or that the hearing officer found him guilty of this charge in retaliation for his exercise of protected First Amendment rights.

Jones–Bey states that he pleaded guilty to this charge. The documentation of the disciplinary process establishes that the conduct report does not state that Jones–Bey asserted religious grounds in his refusal to obey the order; the record of disciplinary hearing does not indicate that he advised the hearing officer that he disobeyed Sgt. Stang's order on religious grounds; and he does not assert

that he advised the hearing officer of the reason he refused to obey the order. Jones–Bey also does not assert that he ever attempted to have his guilty plea set aside by an IDOC administrative appeal. *See Miller v. Indiana Department of Corrections*, 75 F.3d 330 (7th Cir.1996) (applying the holding of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), that persons must have a criminal conviction set aside before seeking damages for that conviction to prisoners challenging prison disciplinary actions in federal court). Moreover, Jones–Bey does not ask this court to set his guilty plea aside, and the record before the court does not contain facts justifying setting aside this guilty plea. *See Wykoff v. Resig*, 613 F.Supp. 1504, 1508 (N.D.Ind.1985).

 Jones–Bey had the opportunity to present the argument that he should not be disciplined for disobeying an order based on his religious beliefs to the disciplinary hearing officer, but he failed to do so. The court concludes that the hearing officer imposed sanctions on Jones–Bey solely because he pled guilty to the charges against him and that the facts presented here do not implicate either the First or Fourteenth Amendments. Jones–Bey's double jeopardy argument states no claim because "it is well settled that the scope of the Double Jeopardy Clause is limited to criminal prosecutions." *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). "Prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

 The centerpiece of Jones–Bey's Fourteenth Amendment claim is his argument that the defendants forced him to live in restrictive conditions without affording him due process. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law." Thus, a plaintiff seeking to establish a violation of the Fourteenth Amendment's Due Process Clause must establish that the state deprived him of a con-

stitutionally protected interest in "life, liberty, or property" without due process of law. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (*citing Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981)). A liberty interest may arise from state law or from the Due Process Clause itself. *Pardo v. Hosier,* 946 F.2d 1278, 1281 (7th Cir.1991). The Due Process Clause does not protect against every change in the conditions of confinement having a substantial adverse impact on a prisoner. *Sandin v. Conner,* — U.S. at —, 115 S.Ct. at 2297, *citing Meachum v. Fano,* 427 U.S. 215, 222, 96 S.Ct. 2532, 2537, 49 L.Ed.2d 451 (1976). Where the due process clause does not itself create protections, only a dramatic departure from the basic conditions of a prisoner's sentence can create circumstances "in which a state might conceivably create a liberty interest." *Sandin v. Conner,* — U.S. at —, 115 S.Ct. at 2301.

█ "Being placed in medical separation is a species of administrative segregation where an inmate is separated from general population by an administrative decision for the protection of others." *Jihad v. Wright,* 929 F.Supp. at 332. "Just as discipline by prison officials in response to misconduct falls within the expected parameters of a sentence imposed by a court of law, so too does placement of an inmate in medical isolation where he has an infectious communicable disease." *Id.* at 333. In *Jihad v. Wright,* this court stated that had Jihad been isolated for only the length of time it took to determine if he had a communicable disease, "this court would have no problem holding that his due process rights had not been violated." *Id.* at 333. Jihad, however, was kept in medical isolation for six months and then was released to general population without ever having been tested for tuberculosis.

In *Sandin v. Conner,* the Supreme Court determined that discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of a sentence imposed by a court of law, and that placement in disciplinary isolation where it did not exceed similarly but totally discretionary confinement in either duration or degree of restriction did not implicate due process. "At the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Sandin v. Conner,* — U.S. at —, 115 S.Ct. at 2301.

In *Jihad v. Wright,* the defendants did not contradict Jihad's claim that the conditions in medical isolation were worse than those in other forms of segregation in effect at the MCC at the same time, and the court determined that the lack of out-of-cell recreation for six months might violate Jihad's Eighth Amendment rights. The court concluded that:

> If avoidance of long term medical isolation in extremely restricted conditions is a dramatic departure from an inmate's sentence in which a state might conceivably create a liberty interest, the court would need to evaluate Indiana law to determine whether Indiana may have created a liberty interest. In *Cameron v. Metcuz,* 705 F.Supp. 454 (N.D.Ind.1989), this court assumed, without deciding, that "medical personnel and health officials responsible for the health and welfare of persons committed to the Department of Corrections are subject to the reporting and preventative measures enacted by the Indiana legislature." In that action, Cameron asserted violation of the Due Process Clause because prison officials had not isolated an HIV positive inmate who subsequently assaulted him. The court concluded that even assuming *arguendo* that Indiana's reporting and preventative measures applied to prisoners confined in the Indiana Department of Correction, they created no liberty interest that benefited Cameron. In this action, however, defendant Wright admits that Jihad was placed on long term medical isolation without a determination having been made that he had a communicable disease. If Indiana could conceivably create a liberty interest for an inmate to avoid long term medical isolation unless he actually has an infectious communicable disease, then the court will have to decide

whether Indiana's reporting and preventative measures apply to inmates.

*Jihad v. Wright,* 929 F.Supp. at 333.

Indiana's statutes governing reporting and preventing the spread of communicable diseases include "a provision granting Indiana health officials the power to *restrict* and even *isolate,* individuals with communicable diseases who pose a serious threat to the public health." *Cameron v. Metcuz,* 705 F.Supp. at 461 (emphasis in original). Indiana Code § 16–1–9.5–4, provided that where the secretary of the local board of health or the health officer determines that the individual presents a serious and present danger to health then they can obtain a court order for restrictions upon the individual, which may include isolation, based upon a showing that the individual poses a clear and convincing evidence of the serious and present health threat to others.

Based on the circumstances in *Jihad v. Wright,* this court concluded further briefing was advisable before ruling on the questions of whether the due process clause creates a liberty interest in an inmate not being placed in long term medical isolation in conditions worse than other forms of segregation at the institution unless he actually has a communicable disease; whether this would present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest; and whether Indiana has created such a liberty interest. *Jihad v. Wright,* 929 F.Supp. at 334. In the instant case, however, prison officials involved Indiana health officials at an early date and apparently did not confine Jones–Bey any longer than it took to get a court order to have him tested, and to conduct and read the test. Moreover, unlike *Jihad v. Wright,* Jones–Bey does not allege that the conditions on the medical isolation unit were worse than those in other forms of segregation in effect at that time. This court concludes that isolating Jones–Bey for the length of time necessary to obtain a court order and test him to determine if he had a communicable disease without a hearing did not violate the Fourteenth Amendment's due process clause.

For the reasons stated in this portion of the memorandum, the court GRANTS the defendants' motion for summary judgment on each of Jones–Bey's Fourteenth Amendment claims.

### V.

In Count 1 of his complaint, Jones–Bey asserts that requiring him to take a TB injection test or be placed in medical separation violated his right to exercise his religious beliefs as secured by the First Amendment and the Religious Freedom Restoration Act ("RFRA"); [6] in Count 2, he asserts that the defendants retaliated against him by placing him in medical isolation because he refused to allow them "to inject poison T.B. Germ into Plaintiff's body based on Plaintiff's Islamic beliefs and practices;" and in count 3, he asserts that the defendants violated his First Amendment associational rights by moving him out of a cell in which he had a fellow Muslim inmate next door and into a unit in which he had no co-religionists with whom to associate. In count 4, he asserts that the defendants violated his Fourth Amendment rights by illegally seizing him and medically isolating him "without justification other than vindictiveness for plaintiff adhearing (sic) to his religious beliefs." Jones–Bey's allegations do not implicate the Fourth Amendment which, and the court will treat this as a First Amendment claim.

Jones–Bey alleges in his complaint that in general population he was able to "study, worship, associate, and practice his beliefs" with other members of his religion and that another member of his religious sect was in an adjoining cell. He asserts that placement in the medical separation unit infringed upon his right to associate with other members of his religion. In his memorandum opposing summary judgment, Jones–

---

**6.** Jones–Bey does not mention the RFRA in his complaint, but he relies on it heavily in his response to the defendants' summary judgment motion. The defendants dismiss Jones–Bey's RFRA claims by stating that he "asserts no claims under the Religious Freedom Restoration Act." The RFRA, however, applies to civil rights actions involving alleged burdens on free exercise of religion, even if the parties do not raise the issue in their pleadings. *Muslim v. Frame,* 897 F.Supp. 215, 216–217 (E.D.Pa.1995).

Bey contends that his inability to attend congregate religious services while medically separated violated his First Amendment rights. The plaintiff's movement from a cell adjacent to a co-religionist to a cell where he did not have a member of his sect as a neighbor states no claim of constitutional magnitude. The court will examine Jones–Bey's claim that he was denied the opportunity to attend congregate religious services.

The defendants argue, citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), that even assuming *arguendo* that Jones–Bey has a constitutionally protected right to freedom of association for religious purposes, that right was not violated by medically separating him because prison regulations do not violate the First Amendment so long as the restrictions are reasonably related to a legitimate penological interest. In response, Jones–Bey cites *Nolley v. County of Erie,* 802 F.Supp. 898 (W.D.N.Y.1992), for the proposition that he is entitled to damages for his inability to attend corporate religious services while he was medically separated.

The case cited by Jones–Bey is the sequel to *Nolley v. County of Erie,* 776 F.Supp. 715 (W.D.N.Y.1991), in which the court reviewed the segregation of an HIV positive inmate from the general population. In that case, the court noted that "(t)he right to attend congregate religious services is not absolute. The Supreme Court has held that where denial of access to such services is reasonably related to legitimate penological services, it is valid," and that several cases "have upheld denial of access to communal services based in part on the serious security concerns of the prison." *Nolley v. County of Erie,* 776 F.Supp. 715 at 741–742 (citations omitted). A prison official testified that, over a lengthy period of time, he did not follow the institution's policy of allowing segregated inmates to attend church services because "he feared that plaintiff might infect other inmates with HIV during church services," and admitted that in doing so he had "substituted his own layman's understanding of how the HIV virus can be transmitted for expert medical opinions on the subject." *Id.* at 742. His "opinions in this regard were completely con-

tradicted by Dr. Hewett, who testified on the limited way in which the HIV virus can be passed." *Id.* at 742. The court concluded that although preventing the spread of HIV infection was a legitimate penological objective, there was no evidence "which would show that the decision to deny plaintiff access to church services was reasonably related to that purpose." *Id.* at 742.

■ The MCC is a "supermaximum" institution which is used to house the most troublesome of Indiana's prisoners. The operation of the MCC has been heavily litigated in this court, including a class action lawsuit posing a broad challenge to the restrictive practices at the facility. In 1993, the general policy in effect at the MCC provided that inmates were isolated from other inmates at all times, and the court is not convinced that even inmates in "general population" were allowed to attend congregate religious services because of security concerns. The record in this action, however, is not clear in that regard so, for the purposes of this motion, the court will assume that MCC inmates who not on segregated status were allowed to attend corporate religious services.

The parties in this action agree that tuberculosis, unlike HIV, is an easily communicable airborne disease, and the courts have recognized that "the state has a compelling interest in 'protecting inmates and DOCS staff from tuberculosis.'" *Jihad v. Wright,* 929 F.Supp. at 330, *quoting Jolly v. Coughlin,* 76 F.3d at 477. The medical separation unit was designed to hold inmates who had not been tested for tuberculosis only until a court order could be obtained to test them. The defendants argue that they could not be sure whether any of these inmates might be infected with TB, and according to Jones–Bey's submissions, several inmates did test positive for TB. The court concludes that denying Jones–Bey the opportunity to attend corporate religious services for the brief period required to have him tested for TB, and to determine the actual TB status of the inmates on the unit, did not violate his First Amendment rights because it was sufficiently related to the legitimate penological objective of preventing the spread of TB at the MCC.

The remainder of Jones–Bey's First Amendment claims are variations of the allegation that requiring him to take a TB injection test or be placed in medical separation violated his right to exercise his religious beliefs as secured by the First Amendment and the RFRA. To succeed under a First Amendment free exercise of religion claim, a plaintiff must demonstrate that prison regulations are not "reasonably related" to a legitimate penological interest. *Turner v. Safley,* 482 U.S. at 89, 107 S.Ct. at 2261; *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987); *Johnson–Bey v. Lane,* 863 F.2d 1308, 1310 (7th Cir.1988). The Religious Freedom Restoration Act restored the "compelling interest" test for defense to claims that a facially neutral law of general applicability substantially burdens the free exercise of religion—a test that had been abandoned by the Supreme Court in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The RFRA requires the courts to apply the law as set forth in two earlier free exercise cases, *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See* 42 U.S.C. § 2000bb(b)(1). Under the RFRA, courts are to apply the compelling interest test to prison inmates' free exercise claims. *Jolly v. Coughlin,* 76 F.3d 468 at 475, and the defendant must show that the action taken by him was the least restrictive means to further the asserted compelling state interest. *Jolly v. Coughlin,* 76 F.3d at 479; *Jihad v. Wright,* 929 F.Supp. at 329.

The defendants do not assert that Jones–Bey's right to the free exercise of his religion was not substantially burdened, nor do they challenge the sincerity or religious nature of Jones–Bey's beliefs. The defendants rely on the argument that the state's interest in preventing the spread of TB at the MCC overrides any interest Jones–Bey might hold in the free exercise of his religion. "The plaintiff's steadfast adherence to his claim that submitting to the PPD test would violate the tenants of his religion, despite his continued confinement in medical keeplock, establishes that his right to the free exercise

of religion has been substantially burdened." *Jihad v. Wright,* 929 F.Supp. at 330, *quoting Jolly v. Coughlin,* 894 F.Supp. 734, 743 (S.D.N.Y.1995).

Under the RFRA, "(o)nce a plaintiff makes a threshold showing of a substantial burden on the right of free exercise, the government must demonstrate that the application of the burden to the individual furthers a compelling state interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b)." *Jolly v. Coughlin,* 76 F.3d at 477. "The state has a compelling interest in protecting inmates and staff from tuberculosis, *Jihad v. Wright,* 929 F.Supp. at 330, but placing an inmate in medical keeplock, or forcing him to take a PPD test is not the least restrictive method of achieving this goal.

To the extent that the government's interest is in protecting inmates and staff from tuberculosis, the defendants have not shown that the plaintiff's confinement is the least restrictive means of furthering that interest. Only *active* tuberculosis is contagious; the defendants' primary concern must therefore be to prevent the plaintiff from developing active tuberculosis and thereby becoming a source of contagion. By identifying inmates with latent tuberculosis, the PPD test serves to identify those inmates at risk of developing active tuberculosis. The plaintiff, by refusing to take the PPD test, *is also at risk of developing active tuberculosis,* because his TB status is unknown. The defendants could treat him as an inmate at risk—as though he had tested positive and refused to take preventive medication. The defendants could require his periodic submission to chest x-rays and spatum samples.

*Jihad v. Wright,* 929 F.Supp. at 330–331, *citing Jolly v. Coughlin,* 76 F.3d at 479 (emphasis in original).

Under this analysis, MCC officials would not be entitled to summary judgment because placing Jones–Bey in a medical isolation unit simply because he refused to take a TB test by injection is not the least restrictive way to meet the state's interest in preventing the spread of that disease at the

MCC. As a less restrictive measure, officials could have treated him as an inmate at risk of developing active tuberculosis by requiring him to submit to periodic chest x-rays or spatum samples to determine if he had active TB and was therefore capable of infecting others. If he was found to be infectious, then further steps would have been in order. Jones–Bey asserts that he had been tested by x-ray on previous occasions at MCC to determine if he had active TB.

 But the events discussed in this complaint occurred in September and October of 1993. The RFRA was not signed into law until November 16, 1993, and was not in effect at the time Jones–Bey was housed in the medical separation unit. The RFRA is retroactive in application, *Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995), but the defendants raised the defense of qualified immunity, which applies to RFRA claims arising prior to the statute's enactment. *Werner v. McCotter*, 49 F.3d at 1481–1482; *Muslim v. Frame*, 897 F.Supp. 215, 221 (E.D.Pa.1995).

The qualified immunity doctrine provides that officials performing discretionary functions are immune from damage claims if their challenged conduct did not violate a clearly established constitutional right of which a reasonable person would have known, given the circumstances and information possessed by the official at the time of the conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 820, 102 S.Ct. 2727, 2738–2739, 73 L.Ed.2d 396 (1982). Because the actions challenged by Jones–Bey occurred before the RFRA was enacted, "the pre-RFRA reasonableness standard, rather than RFRA's strict scrutiny test," governs the question of whether the defendants actions violated the free exercise clause. *Muslim v. Frame*, 897 F.Supp. at 221. This court concludes that the defendants would have had no reason to believe that segregating an inmate who refused to accept TB testing by injection, for the length of time necessary to obtain a court order and conduct the test, would have violated his First Amendment rights because it was not then clearly established that such actions violate the free exercise clause. The defendants acted reasonably and in good faith under the then-applicable legal standards and, accordingly, they are immune from damage claims based on their placing Jones–Bey in medical isolation until he could be tested.

For the reasons stated in this portion of the memorandum, the court **GRANTS** the defendants' motion for summary judgment on each of Jones–Bey's First Amendment claims.

### VI.

For the foregoing reasons, the court **GRANTS** the defendant's summary judgment motion [docket entry # 30]. The clerk is directed to enter summary judgment in favor of the defendants.

**SO ORDERED.**